2012 ME 132

**STATE of Maine**

v.

**Nathaneal K. NIGHTINGALE.**

Supreme Judicial Court of Maine.

Argued: Sept. 12, 2012.

Decided: Nov. 29, 2012.

---

Hunter J. Tzovarras, Esq. (orally), Bangor, for appellant Nathaneal Nightingale.

William J. Schneider, Attorney General, and Donald W. Macomber (orally), Asst. Atty. Gen., Augusta, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SILVER, J.

[¶ 1] Nathaneal K. Nightingale appeals from a judgment of conviction of one count of murder, 17–A M.R.S. § 201(1)(A) (2011), and one count of manslaughter (Class A), 17–A M.R.S. § 203(1)(A) (2011), entered in the trial court (*Anderson, J.*) following a jury trial. Nightingale argues that the court erred in denying his motion to suppress a confession, other statements, and physical evidence found as a result of the statements. We affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

[¶ 2] Michael L. Miller and Valerie J. Miller were shot and killed in their home in Webster Plantation on November 28, 2009. At some point in the investigation, it was determined that Nightingale was either the last person or one of the last persons to be at the Millers' home. The police contacted Nightingale to see whether he would be willing to take a polygraph test after Nightingale told the police that a woman came to the Millers' house just as he was leaving. Nightingale agreed and drove himself to the Criminal Investigation Division located at the Dorothea Dix building on Hogan Road in Bangor, arriving at the scheduled time on December 11, 2009. The room in which the examination was conducted was about ten by twelve feet, with a polygraph chair, additional chairs for the two detectives who participated, and a table for the equipment. To exit the room, Nightingale would have needed to walk past one or both officers who participated.

[¶ 3] Maine State Police Supervisor Warren Ferland conducted the polygraph examination. The entire process lasted just over nine hours and was captured on video files that were admitted at the motion hearing.[1] At the beginning of the interview, Ferland informed Nightingale that he was not under arrest. Ferland, who gave Nightingale the *Miranda* warnings as part of a polygraph waiver form, testified that he was "very satisfied that [Nightingale] understood his rights," based on Nightingale's responses, his education, which included some college-level work, and his military experience. Nightingale was thirty-one years of age at the time of the examination. Ferland told Nightingale that the examination could only be administered if it is undertaken voluntarily, and Nightingale had "the right to stop the test at any time and leave." Ferland explained to Nightingale that "the door was closed just for privacy, he could leave any time, all he had to do was get up

---

1. We note again that the results of polygraph tests are completely inadmissible because they have "non-existent value when it comes to determining credibility." *State v. Harnish*, 560 A.2d 5, 8 (Me.1989) (quotation marks omitted).

and go." Ferland testified that he believed he told Nightingale specifically that Nightingale was not in custody.

[¶ 4] The process was divided into three sections. The first was the pre-test interview, which started at about 10:30 a.m. The first part is designed to determine whether the person being tested is suitable for testing based on his or her medical and psychological condition. The second part, consisting of polygraph data collection, started at 12:42 p.m. and lasted until 1:42 p.m. The third section was the post-test interview, which began at 2:20 p.m., after the first extended break. At about 3:40 p.m., Ferland was joined by Detective Dale Keegan. They took a second break at 4:30 p.m. When Nightingale returned, Ferland offered him a drink, which he declined. The third break was at about 6:15 p.m.

[¶ 5] During the third break, they gave Nightingale a sandwich and then resumed at about 7:10 p.m. Ferland testified that he "went over Miranda again" with Nightingale. Again, Nightingale told Ferland and Keegan that he understood his rights and wanted to continue to talk. Keegan testified that he and Ferland pointed out the inconsistencies in Nightingale's story. Ferland testified that just before 7:35 p.m., he told Nightingale that he knew that Nightingale "was the one who actually took the lives of Mr. and Mrs. Miller. And at that point is when he told me that he thought that, you know, he should have an attorney." Ferland then terminated the interview. Ferland testified that Nightingale said that he wanted to talk with some family members and would be back in contact with Keegan the next day.

[¶ 6] Ferland testified that he told Nightingale "throughout the process several times" that he was "not under arrest, he was free to leave at any time, he could stop the process any time he wanted to

and, you know, that he was going to be going home that night." The two officers were not dressed in uniform and were not visibly armed. There was no confrontation or raised voices, and there were no threats or promises.

[¶ 7] During the post-test interview, Ferland and Keegan suggested to Nightingale that they potentially had satellite photography of his car at the Millers' home; had DNA test results showing that Nightingale's DNA was on a doorknob and a locking mechanism at the Millers' home, which was significant because it appeared that the last person out had locked the door; had found flakes of Nightingale's skin on the Millers' bodies; and had recovered fingerprint or DNA evidence on money that the detectives told Nightingale they had seized from his father. These were "realistic bluffs" and untrue.

[¶ 8] Approximately three hours after the nine-hour interrogation ended, law enforcement received information that Nightingale had confessed to his mother and a friend. Keegan testified that at about 10:30 p.m., his supervisor asked him to check on Nightingale's welfare because Nightingale's friend "was concerned that he may be suicidal." Keegan called Nightingale on the telephone. According to Keegan, Nightingale seemed "very calm . . . too calm, if you will," and told Keegan that he would meet with him the next day. In spite of this, Keegan and Detective Darrin Crane went to and entered Nightingale's residence, which was his mother's home, in order to initiate contact with him again. A third officer remained outside. Although there was testimony at the hearing that Nightingale had ingested several crushed Percocet pills, a narcotic, after the nine-hour interrogation, Nightingale's ability to comprehend the subsequent interrogation at his residence is not at issue in this appeal. An audio recording and a

transcript of the interrogation in Nightingale's home were admitted without objection at the suppression hearing.

[¶ 9] Keegan admitted that although concern for Nightingale's well-being, based on the report of suicide risk, was the primary reason for contacting Nightingale, a secondary purpose was to talk with Nightingale in light of his confessions to others. Keegan also admitted that he was the one to initiate the questioning on the topic of Nightingale's confession to his mother and his friend. After confirming that Nightingale had spoken to his mother and friend, Keegan asked whether Nightingale had told them "that one [killing] was an accident and one was on purpose." Nightingale responded in the affirmative. The State concedes that Nightingale was in custody shortly after the two officers entered his residence and therefore the initial statements are inadmissible.

[¶ 10] Keegan then read Nightingale his *Miranda* rights, after which Nightingale made further and more detailed inculpatory statements. At the outset of the post-*Miranda* questioning, Keegan referred back to Nightingale's pre-*Miranda* statements, and got Nightingale to confirm that he had previously said he was "responsible for this" and that "one was an accident and one was on purpose." It is evident in the transcript that Keegan was interrupted by the arrival of Nightingale's mother as he was going over the *Miranda* warnings. He did not obtain an express waiver before getting Nightingale's post-warning confession. He obtained the waiver at the end of the in-home interrogation.

[¶ 11] After Nightingale confessed, he told the police that he had taken the Millers' safe and some other things to a camp belonging to his mother and stepfather, and he agreed to take the officers there. At the camp, the officers found a safe and a bag with some items in it, all belonging to the Millers.

[¶ 12] Nightingale was indicted in December 2009 on two counts of murder. He moved to suppress all statements he made during the polygraph interview, all statements made during the interrogation at his residence, and the physical evidence seized at the camp. The court granted the motion only as to the pre-warning statements made during the interrogation at Nightingale's residence, and denied the motion as to (1) the statements Nightingale made during the interrogation at the Criminal Investigation Division, (2) the post-warning statements he made during the interrogation at his residence, and (3) the physical evidence seized after the post-warning statements.

[¶ 13] A six-day jury trial was held in May 2011. An audio file of the post-warning statement from the in-home interrogation was admitted in evidence at trial. The jury returned a verdict of guilty of the lesser-included offense of manslaughter on count one for the death of Michael Miller and guilty of murder on count two for the death of Valerie Miller. In September 2011, the court entered a judgment of conviction on both counts and sentenced Nightingale to concurrent terms of fifteen years on count one and forty years on count two, with no time suspended and no probation.

## II. DISCUSSION

[¶ 14] Nightingale argues that he was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), during the interrogation at the Criminal Investigation Division and that Keegan's re-initiation of questioning at Nightingale's home several hours after the first interrogation ended with Nightingale's request for counsel was therefore a violation of the fourteen-day

waiting period of *Maryland v. Shatzer,* 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). Nightingale further argues that his statements during the second interrogation at his home were unconstitutionally obtained because Keegan employed a two-step interrogation procedure in violation of *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and because the officers' fabrication of evidence during the first interview rendered his later statements involuntary. Lastly, Nightingale argues that the court should have suppressed the physical evidence found at the camp as the fruit of the alleged constitutional violations.

A. Custody

[¶ 15] Nightingale argues that he was in custody at the Criminal Investigation Division on December 11 when he underwent the polygraph exam and the questioning leading up to it and following it. "We review the denial of a motion to suppress for clear error as to factual findings and de novo as to issues of law." *State v. Gould,* 2012 ME 60, ¶ 11, 43 A.3d 952. In order for Nightingale's argument to prevail, we must conclude that the trial court's factual findings were in error or the trial judge did not apply the law correctly. In determining whether a defendant was in custody, "the ultimate inquiry is whether a reasonable person standing in the shoes of [the defendant would] have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Poblete,* 2010 ME 37, ¶ 22, 993 A.2d 1104 (alteration in original) (quotation marks omitted).

[¶ 16] In *State v. Bridges,* 2003 ME 103, ¶¶ 35–36, 829 A.2d 247, we held that the defendant was in custody when police interviewed her in a small bedroom at a fire station, with the doors closed, over the course of nearly six hours. The police, not the defendant, initiated the interview, after the defendant's mother drove her to the station. *Id.* ¶ 27. Although the officers told the defendant she was free to leave, they did not administer *Miranda* warnings, and at one point told the defendant she needed to "sit there ... and tell the truth." *Id.* ¶¶ 28, 32 (alteration in original). The officers ignored the defendant's repeated requests to speak to her uncle, refused to allow the defendant's mother to see her, and separated the defendant from her baby. *Id.* ¶¶ 32–33, 35. The defendant had no shoes and, after her mother left with the baby, no vehicle. *Id.* The defendant repeatedly told the officers she was not feeling well, and remained in a highly emotional state throughout the interviews. *Id.* ¶ 32.

[¶ 17] Here, Nightingale voluntarily participated in the interview after police asked whether he would be willing to undergo a polygraph examination. Nightingale drove himself to the Criminal Investigation Division. During the nine-hour interview, Nightingale was given the *Miranda* warnings twice. He was in a relatively small room with two unarmed detectives, dressed in street clothes. The officers told Nightingale at the beginning and end of the interview that he was free to terminate the interview at any time. He took breaks for food and to smoke. He appeared calm throughout the interview.

[¶ 18] Although there are factors that could support the conclusion that Nightingale was in custody, in particular the duration of the interrogation, *see State v. Michaud,* 1998 ME 251, ¶ 4, 724 A.2d 1222 (setting forth factors courts may consider in custodial analysis), the most compelling factor leans the other way: Nightingale terminated the marathon interview after the detectives accused him of committing

the killings. At this point, he said he wanted to consult with a lawyer. He left because he decided to leave and the police officers let him leave. On these facts, the trial court did nor err in finding that Nightingale was not in custody during the first interrogation.

## B. The *Shatzer* Rule

 [¶ 19] In *Shatzer*, the U.S. Supreme Court set a "minimum fourteen-day waiting period between the time the suspect is released from custody and when the police can reinitiate interrogation after the suspect initially invoked his or her right to counsel" pursuant to *Miranda*. *State v. Knowlton*, 2012 ME 3, ¶ 17, 34 A.3d 1139 (citing *Shatzer*, 559 U.S. 98, 130 S.Ct. at 1223). For this protection to come into play, a suspect must first invoke his or her *Miranda* right to counsel while in custody. *See Shatzer*, 559 U.S. 98, 130 S.Ct. at 1223 ("[T]he courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress."); *see also McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) ("We have ... never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than custodial interrogation." (quotation marks omitted)); *State v. Lavoie*, 562 A.2d 146, 149–50 (Me.1989) (concluding that precustodial invocation of right to silence did not preclude interrogation of defendant after he was taken into custody). Because the trial court did nor err in concluding that Nightingale was not in custody during the interrogation surrounding the polygraph, it follows that *Shatzer's* fourteen-day waiting period does not apply. *See* 559 U.S. 98, 130 S.Ct. at 1223, 175 L.Ed.2d 1045.

## C. Two–Step Interrogation

[¶ 20] Nightingale argues that his post-warning statements at his home should have been suppressed because the police employed a two-step interrogation procedure—that is, Keegan elicited a confession from Nightingale, administered *Miranda*, and then obtained a post-warning confession. The United States Supreme Court has addressed this "*Miranda*-in-the-middle" situation in two seminal cases: *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Seibert*.

[¶ 21] Elstad was convicted of burglary. *Elstad*, 470 U.S. at 300, 105 S.Ct. 1285. He was eighteen years old and living with his parents at the time of the interrogation at issue, and he was a neighbor of the victims and a friend of their son. *Id.* When two officers arrived at the Elstad's home, his mother answered the door. *Id.* The officers asked Elstad, who was in his bedroom, to dress and come into the living room. *Id.* One officer asked his mother to step into the kitchen, where he explained that they had a warrant for her son's arrest. *Id.* at 300–01, 105 S.Ct. 1285. The other officer remained in the living room with Elstad. *Id.* at 301, 105 S.Ct. 1285. That officer testified:

> I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, "Yes, I was there."

*Id.* Elstad was transported to the sheriff's headquarters, given *Miranda* warnings for the first time about one hour later, waived his rights, and gave a full confession. *Id.*

[¶ 22] The Court held that "there is no warrant for presuming coercive effect

where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318, 105 S.Ct. 1285. The Court further indicated:

> [I]n any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Id.* The Court rejected the argument that to cure the *Miranda* violation the police must tell the suspect that his prior statement may not be used against him. *Id.* at 316, 105 S.Ct. 1285. "This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness." *Id.*

[¶ 23] The facts at issue in *Seibert* differed significantly from those in *Elstad* in terms of police conduct. Seibert was convicted of murdering a mentally ill teenager in a fire deliberately set to destroy the dead body of Seibert's disabled son in order to conceal the son's bedsores that indicated that Seibert had neglected him be-

fore he died in his sleep. *Seibert,* 542 U.S. at 604, 606, 124 S.Ct. 2601. Seibert was arrested at 3:00 a.m. in the hospital where her other son, who was complicit in the murder, was recovering from burns. *Id.* at 604, 124 S.Ct. 2601. She was taken to the police station, left alone in an interview room for fifteen to twenty minutes, and questioned without *Miranda* warnings for thirty to forty minutes while the officer squeezed her arm and repeatedly referred to the victim, saying "Donald was also to die in his sleep." *Id.* at 604–05, 124 S.Ct. 2601. After she admitted that she knew that the victim was meant to die in the fire, she was given a twenty-minute coffee and cigarette break and given *Miranda* warnings, after which she signed a waiver and, upon being confronted with her pre-warning statements, gave a complete confession. *Id.* at 605, 124 S.Ct. 2601. The interrogating officer admitted that he made a "conscious decision" to initially withhold *Miranda* warnings and question Seibert, and then give the warnings and ultimately get Seibert to repeat her unwarned statements. *Id.* at 605–06, 124 S.Ct. 2601.

[¶ 24] The plurality in *Seibert* suggested that the following factors are relevant in determining whether confessions elicited after "midstream" *Miranda* warnings are admissible:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615, 124 S.Ct. 2601 (plurality opinion). The Court noted:

> The unwarned interrogation was conducted in the station house, and the

questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used.... The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

*Id.* at 616–17, 124 S.Ct. 2601.[2]

[¶ 25] Justice Kennedy's concurrence in *Seibert* focuses on whether the two-step questioning process was a "deliberate" or "intentional" tactic by the police to undermine *Miranda*. *Id.* at 620–21, 124 S.Ct. 2601 (Kennedy, J., concurring). "The admissibility of postwarning statements

should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id.* at 622, 124 S.Ct. 2601. Justice Kennedy disagreed with the plurality's test, which he noted does not distinguish between intentional and unintentional two-stage interrogations. *Id.* at 621–22, 124 S.Ct. 2601.

[¶ 26] Under Justice Kennedy's analysis, if the police deliberately used a two-step process, the question would then be whether curative measures made the *Miranda* warnings effective:

> Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.

*Id.* at 622, 124 S.Ct. 2601 (citation omitted).

[¶ 27] The majority of the federal circuit courts have adopted the reasoning of Justice Kennedy's concurrence, requiring an initial inquiry into the deliberateness of the two-step procedure, as controlling. *See, e.g., United States v. Williams*, 681 F.3d 35, 41 (2d Cir.2012) ("[W]e join[ ] our sister circuits in regarding Justice Kennedy's concurrence in *Seibert* as controlling."

---

2. In *Seibert,* the plurality characterized the "question-first" practice as popular in law enforcement; at least until the decision in *Seibert,* this interrogation method was actually departmental policy in many places, and a

national police training organization trained law enforcement officers in the technique. *Missouri v. Seibert,* 542 U.S. 600, 609–11, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion).

(citing *United States v. Carter*, 489 F.3d 528 (2d Cir.2007))); *United States v. Nunez–Sanchez*, 478 F.3d 663, 668 n. 1 (5th Cir.2007) (identifying Justice Kennedy's concurrence as the "holding" of the *Seibert* Court (quoting *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir.2006))); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir.2006) ("Because *Seibert* is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law."); *United States. v. Ollie*, 442 F.3d 1135, 1142 (8th Cir.2006) ("Because Justice Kennedy provided the fifth vote and his concurrence resolved the case on narrower grounds than did the plurality, it is his reasoning that rules the present case."); *United States v. Williams*, 435 F.3d 1148, 1157–58 (9th Cir.2006) ("[W]e hold that a trial court must suppress post-warning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights."); *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir.2006) ("This Court applies the *Seibert* plurality opinion as narrowed by Justice Kennedy." (citing *United States v. Naranjo*, 426 F.3d 221, 231–32 (3d Cir. 2005))); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir.2005) ("Justice Kennedy's opinion ... represents the holding of the *Seibert* Court.").

[¶ 28] Several circuits have not yet decided the issue of which *Seibert* test governs. *See, e.g., United States v. Widi*, 684 F.3d 216, 221 (1st Cir.2012); *United States v. Johnson*, 680 F.3d 966, 978–79 (7th Cir. 2012); *United States v. Pacheco–Lopez*, 531 F.3d 420, 427 n. 11 (6th Cir.2008); *United States v. Carrizales–Toledo*, 454 F.3d 1142, 1151 (10th Cir.2006). Some courts have expressed doubt as to whether Justice Kennedy's concurrence represents the narrowest grounds for decision and thus whether his deliberateness analysis operates as controlling precedent. *See United States v. Heron*, 564 F.3d 879, 884–85 (7th Cir.2009) ("Although Justice Kennedy provided the crucial fifth vote for the majority, we find it a strain at best to view his concurrence taken as a whole as the narrowest ground on which a majority of the Court could agree."); *Carrizales–Toledo*, 454 F.3d at 1151 (noting difficulty in viewing Justice Kennedy's concurrence as controlling given that a majority of the Court rejected an intent-based analysis); *see also United States v. Rodriguez–Preciado*, 399 F.3d 1118, 1139–41 (9th Cir. 2005) (Berzon, J., dissenting in part) (opining that *Seibert* produced no binding precedent and urging adoption of plurality test). Although the First Circuit has referred to Justice Kennedy's concurrence in *Seibert* as the "controlling opinion," *United States v. Rogers*, 659 F.3d 74, 79–80 (1st Cir.2011), it recently maintained that it "has not settled on a definitive reading" of the case, *Widi*, 684 F.3d at 221; *see also United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir.2010) (declining to decide whether concurrence or plurality controls); *United States v. Jackson*, 608 F.3d 100, 103–04 (1st Cir.2010) (same).

■ [¶ 29] We have previously described the holding in *Seibert* as standing for the proposition that "when the police delay giving a *Miranda* warning until after confession in a *strategic effort* to coerce the confession, the police misconduct may sufficiently taint all of the individual's statements, notwithstanding later warnings, and suppression is required." *State v. Dodge*, 2011 ME 47, ¶ 18 n. 8, 17 A.3d 128 (emphasis added) (citing *Seibert*, 542 U.S. at 617, 124 S.Ct. 2601 (plurality opinion)). We now follow the majority of the federal circuits in applying Justice Kennedy's *Seibert* analysis. Accordingly, the State bears the burden of demonstrating

by a preponderance of the evidence that the two-step procedure was not deliberately employed to undermine the efficacy of the *Miranda* warnings. *Williams*, 681 F.3d at 41; *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir.2008); *Ollie*, 442 F.3d at 1142–43. In determining whether the procedure was deliberate, courts must consider "the totality of the objective and subjective evidence." *Williams*, 681 F.3d at 41 (quoting *United States v. Capers*, 627 F.3d 470, 479 (2d Cir.2010)); *see also United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir.2009); *Williams*, 435 F.3d at 1158–59.

[¶ 30] Here, the State conceded that Nightingale was in custody and subject to interrogation when the detectives first arrived at his mother's home on the evening of the polygraph, and as a result, the trial court suppressed all statements Nightingale made before *Miranda* warnings were given to him. The trial court found that the detectives had mixed motives when they arrived at the home. One purpose was to check on the status of Nightingale, in light of reports of possible suicide plans, and the other purpose was to take a statement from him after reports that he confessed to his mother and girlfriend. First, we note that Nightingale had been given his *Miranda* warnings twice, the most recent approximately five hours earlier. Second, in light of the suicide reports, the detectives were concerned about Nightingale's safety. Events were moving rapidly when the detectives first arrived at the home in the late evening hours. After carefully reviewing the record, the trial court found that the detectives' actions did not reflect a deliberate strategy to use "*Miranda*-in-the-middle." We find no error in its determinations.

## D. Voluntariness

[¶ 31] Nightingale next argues that the use of deception by the police during the nine-hour interrogation rendered his in-home, post-warning confession involuntary. Nightingale does not contest the admission of any statements made during the nine-hour interrogation.

[¶ 32] The standard of review is clear error as to the factual findings and de novo as to the law. *See State v. Lavoie*, 2010 ME 76, ¶ 13, 1 A.3d 408. "[T]he State bears the burden of proving voluntariness beyond a reasonable doubt." *Id.* ¶ 18 (alteration in original) (quotation marks omitted). "Whether a confession is voluntary is primarily a question of fact." *Gould*, 2012 ME 60, ¶ 11, 43 A.3d 952 (quotation marks omitted).

[¶ 33] To be voluntary, a confession must be the "free choice of a rational mind," "fundamentally fair," and "not a product of coercive police conduct." *Id.* (quotation marks omitted). The requirement that a statement be voluntary stems from the Fifth Amendment right against self-incrimination and the Fourteenth Amendment right to due process. *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *Dodge*, 2011 ME 47, ¶ 11, 17 A.3d 128. To determine whether a statement was voluntary, we assess "the totality of the circumstances," including

both external and internal factors, such as: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*Dodge,* 2011 ME 47, ¶ 12, 17 A.3d 128 (quotation marks omitted). "We have recognized the practical necessity for the use of deception in criminal investigations...." *State v. Bailey,* 2010 ME 15, ¶ 23, 989 A.2d 716 (quotation marks omitted) (concerning deception as to the purpose of a search). Police trickery may, however, rise to a level where it calls into question the voluntariness of a confession, as where police "mislead the individual during an interrogation as to that individual's constitutionally protected right against self-incrimination." *Dodge,* 2011 ME 47, ¶¶ 14, 16, 17 A.3d 128 (addressing false police assurances of confidentiality); *see also Lavoie,* 2010 ME 76, ¶ 26, 1 A.3d 408 (Levy, J., concurring) ("A deception that actually compromises a suspect's ability to make a free choice of a rational mind, is inherently coercive and fundamentally unfair." (citation and quotation marks omitted)).

[¶ 34] In *State v. Lavoie,* 2010 ME 76, ¶¶ 19–20, 1 A.3d 408, we held that the defendant's confession, given after a polygraph test, was voluntary, based on the following: he volunteered to take the test; drove himself to the test site; was in good health and had slept well; was not under the influence of any substances; exhibited a calm and appropriately responsive demeanor; was questioned by officers not in uniform or armed; had his rights explained to him; and was told the door was closed but unlocked, and he could leave if he wished. Although an officer asked him to write an apology letter to the victim, he also told the defendant he could leave before doing so. *Id.* ¶ 20. We held that the officer's promise of alcohol counseling if the defendant confessed was not an impermissible promise of leniency, and the detective's request that he write the apology and describe specific acts was not coercive. *Id.* ¶¶ 21–22. We also held that the detective's statement that the polygraph test

was "foolproof" in recording physical responses did not constitute a representation about the ability of the machine to detect lies, and was not unlawfully coercive. *Id.* ¶ 23.

[¶ 35] In *State v. Gould,* 2012 ME 60, ¶¶ 11–13, 43 A.3d 952, we held the defendant's confession voluntary, despite a detective's suggestion that he could get the defendant help and that the State would have inculpatory DNA evidence. In so holding, we observed that the interview was conducted in a "very conversational and relaxed manner"; the defendant was not in custody during the questioning; the detective read the defendant his *Miranda* rights, which the defendant waived; the defendant participated freely and volunteered information; and the detective did not make threats or promises of leniency or favorable treatment in exchange for the confession. *Id.* at ¶ 12. We concluded that the detective's promises of help and representations as to DNA evidence were "neither unfairly coercive nor misleading." *Id.* at ¶ 13.

[¶ 36] The court here found with respect to the first interrogation that the detectives' false statements about the evidence did not have any appreciable effect on Nightingale, as he "largely deflected" their questioning and "proceeded through the interrogation undaunted." In holding Nightingale's later statements at his home voluntary, the court also considered that (1) there was no deliberate attempt to circumvent *Miranda;* (2) it is likely that Nightingale's confessions to his mother and his friend made him recognize "the futility in making statements to police that were inherently inconsistent with the statements investigating authorities had obtained from third-party sources"; (3) he was resigned that there was sufficient evidence to arrest him; (4) he was calm,

collected, and methodical in his statements; (5) the interrogation was in the familiar location of his home; (6) there were no promises of leniency in exchange for the statements; (7) there was no trickery or deception employed at Nightingale's home; (8) the officers were non-confrontational; (9) there was no evidence of unlawful coercion; and (10) despite having ingested Percocet, Nightingale was "coherent, alert, and responsive." The court did not err in concluding that the State proved beyond a reasonable doubt that Nightingale's post-warning statements were voluntary in light of the totality of the circumstances. *See Dodge,* 2011 ME 47, ¶ 12, 17 A.3d 128; *Lavoie,* 2010 ME 76, ¶ 13, 1 A.3d 408.

**E. Fruit of the Poisonous Tree**

[¶ 37] Finally, Nightingale argues that the physical evidence obtained as a result of his statements should have been suppressed as the fruits of constitutional violations. Because Nightingale's post-warning statements were voluntary, the court did not err in admitting the physical fruits of those statements. *See United States v. Patane,* 542 U.S. 630, 643, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion) ("Introduction of the nontestimonial fruit of a voluntary statement … does not implicate the Self–Incrimination Clause."); *id.* at 645, 124 S.Ct. 2620 (Kennedy, J., concurring) ("Admission of nontestimonial physical fruits … even more so than the postwarning statements to the police in *Elstad* … does not run the risk of admitting into trial an accused's coerced incriminating statements against himself.").

**F. Conclusion**

[¶ 38] The court did not err in denying Nightingale's motion to suppress as to his

post-warning confession and the physical evidence obtained as a result.

The entry is:

Judgment affirmed.