STATE OF MAINE                                      SUPERIOR COURT

Cumberland, ss.


STATE OF MAINE

v.                                         Docket No. CUMCD-CR-18-30424

TIMOTHY A. SMITH

Defendant


## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

A testimonial hearing on Defendant's Motion to Suppress Statements was held August 8, 2019, with Defendant present and both parties represented by counsel. The sole witness was the investigating officer, Sgt. Patrick Ferriter of the Cumberland County Sheriff's Department.

A DVD containing two audio files was admitted by agreement as State's Ex. 1. After the hearing, the State filed a Memorandum In Opposition to Defendant's Motion to Suppress. The Defendant then filed a Reply Memorandum docketed September 23, 2019, at which point the court took the Motion to Suppress under advisement.

Based on the entire record and for the reasons set forth below, the Defendant's Motion to Suppress is granted in part and otherwise denied.

*Background*

Patrick Ferriter is a patrol sergeant with the Cumberland County Sheriff's Department, having joined the Department about eight years ago. He is a graduate of the Maine Criminal Justice Academy with training in the investigation of suspected operating under the influence offenses.

On the evening of November 2, 2018, Sgt. Ferriter was on duty as a patrol supervisor, and was in uniform in a marked Sheriff's Department vehicle.

At some point around 9 p.m., Sgt. Ferriter was advised that a pedestrian had been struck by a vehicle in the Town of Standish and that the vehicle had left the scene and turned onto Manchester Road. He was given a description of the vehicle as a dark-colored truck—possibly dark blue or black and "possibly lifted" (meaning with a suspension modified so as to cause the vehicle to ride higher). Sgt. Ferriter drove his vehicle to Manchester Road and headed toward the accident scene in hopes of seeing the truck coming toward him on Manchester Road. He saw what appeared to be a dark-colored truck coming toward him from the direction of the reported accident. Until then, no other vehicles had passed him heading the other way.

Suspecting that the truck could be the vehicle involved in the accident, Sgt. Ferriter turned around his vehicle and began to follow the truck. He observed what appeared to be erratic operation—the vehicle slowed almost to a complete

stop in the roadway for no apparent reason and then resumed normal speed. It did not cross the center line or go off the roadway.

Sgt. Ferriter then activated his vehicle's blue lights in order to execute a traffic stop. Sgt. Ferriter noted that the truck continued for several hundred feet before coming to a stop, and considered that to be potentially indicative of driver impairment.

The truck Sgt. Ferriter had stopped was not consistent with all aspects of the description he had been provided—the truck was gray rather than dark blue or black and not noticeably "lifted."

As Sgt. Ferriter exited his vehicle, he noted that the truck ahead of him appeared to be in poor condition, with multiple dents. These attributes, too, were not part of the description he had been provided.

At the driver's side of the truck, he noted that the driver, identified as the Defendant Timothy Smith, was the only person in the truck and that a dog was inside. While Sgt. Ferriter was standing next to the driver's side speaking with the Defendant, he noted that the Defendant was displaying what appeared to Sgt. Ferriter, based on his training and experience, to be signs of intoxication—glossy and bloodshot eyes and slow, slurred speech. He also noted that Defendant appeared to be bewildered.

In response to the sergeant's questioning from outside the vehicle, Defendant said he was coming from a friend's house in East Baldwin and

3

acknowledged that he had consumed alcoholic beverages. Defendant also said he thought he may have been involved in an accident and hit a person—an acknowledgment that Sgt. Ferriter took as confirmation of his suspicion that Defendant's truck was the vehicle involved in the accident. Defendant readily answered the officer's questions without any prompting or encouragement.

At that point, Sgt. Ferriter asked the Defendant to exit his vehicle. Around this point, Deputy Thistlewood of the Sheriff's Department arrived on scene.

Instead of complying with Sgt. Ferriter's directive to exit the vehicle, the Defendant reached into his pocket and into the vehicle for something—behavior that Sgt. Ferriter interpreted as presenting a risk to his safety. He directed the Defendant to stop reaching around and to open the door. Defendant activated the door handle inside the truck but the door did not open. Sgt. Ferriter could not open the door from outside because the outside latch was broken. Defendant again began reaching for something. Increasingly concerned for his and Deputy Thistlewood's safety, Sgt. Ferriter opened the driver's door from inside and pulled the Defendant out of the vehicle.

For officer safety purposes, the officers placed the Defendant in handcuffs and directed him to lean against or sit on the rear bumper of his vehicle. There is no evidence that the Defendant was told that he was not under arrest or that the reason he was being handcuffed was only for officer safety.

4

At that point, the officers noted that the passenger side mirror of the Defendant's truck was damaged and asked him about it. Defendant said the damage had occurred because of the accident.

Sgt. Ferriter then administered three standard field sobriety tests to the Defendant to determine whether there was probable cause to believe he had operated under the influence. Based on his training and experience, Sgt. Ferriter interpreted the results of all three tests as indicative of impairment:

- Sgt. Ferriter noted six out of six clues on the Horizontal Gaze Nystagmus test.

- Defendant declined to take the so-called alphabet test, which involves reciting letters of the alphabet in sequence.

- On the counting backward test, which involves counting numbers in decreasing order and in sequence, Sgt. Ferriter asked Defendant to count from 67 to 52. Defendant counted down to 60 and then counted up to 61 and then continued to count down.

Defendant declined to rate his level of intoxication on a zero to 10 scale but acknowledged that he had consumed several containers of Budweiser beer.

Based on everything he had heard and observed, Sgt. Ferriter determined that there was probable cause to place the Defendant under arrest. After informing the Defendant that he was under arrest, Sgt. Ferriter placed the Defendant, still handcuffed, inside his Sheriff's Department vehicle.

5

The audio file on State's Ex. 1 labeled as Tim Smith Interview.m4a starts at this point. Based on the audio, the conversation initially was as follows:

Sgt. Ferriter said, "You know who I am, right."

The Defendant said, "Right."

Sgt. Ferriter said, "I want to have a conversation with you about what happened tonight, okay?"

Defendant said, "I knew I'd hit somebody, I turned around and came back to help 'em out." This was not said in response to any interrogation and was a spontaneous, volunteered statement.

Sgt. Ferriter did not respond to the Defendant's statement, but said, "Okay, before I continue the conversation with you I need to make sure you know your rights. Do you know your rights?"

The Defendant said, "Yes."

Sgt. Ferriter then advised the Defendant of most but not all of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Sgt. Ferriter's recitation of rights omitted any reference to the Defendant's statements being used against him in a court of law.

After the recitation, Sgt. Ferriter asked the Defendant a series of questions about his whereabouts; his level of alcohol consumption and the circumstances of the accident. The questioning lasted less than five minutes. State's Ex. 1 (Tim Smith Interview.m4a at 0:55-5:37). Sgt. Ferriter then advised the Defendant that

6

he had decided Defendant was impaired and would be taking Defendant to the Jail.

During the ride to the Cumberland County Jail, Sgt. Ferriter did not question the Defendant.

At some point during the drive, Sgt. Ferriter realized he had omitted a portion of the required *Miranda* warnings, and once they arrived at the Jail, he again administered *Miranda* warnings to the Defendant, this time including all required warnings. State's Ex 1 (Tim Smith2.m4a at 0:18-0:55). The Defendant acknowledged that he understood the warnings and agreed to answer questions. State's Ex 1 (Tim Smith2.m4a at 1:00-1:04).

Sgt. Ferriter then asked many of the same questions he had asked at the scene of the accident, but did not refer to the prior questioning or to the responses Defendant had previously given in response. Even so, the Defendant answered the questions in much the same way as he had at the scene. The questioning at the Jail lasted less than five minutes. State's Ex 1 (Tim Smith2.m4a at 1:05-5:40).

*Analysis*

Defendant's Motion to Suppress challenges the admissibility of all of the State's evidence based on the alleged invalidity of the traffic stop and also challenges the admissibility of Defendant's admissions because they were in response to custodial interrogation.

7

There are six phases of the interaction between Defendant and Sgt. Ferriter:

1. The phase before the traffic stop.

2. The phase starting with Sgt. Ferriter's questions while Defendant was inside his truck and ending when the Defendant was pulled out of his truck and handcuffed.

3. The phase starting after the Defendant was placed in handcuffs and ending when he entered Sgt. Ferriter's vehicle.

4. The phase starting when Sgt. Ferriter first gave Defendant *Miranda* warnings.

5. The phase involving the trip to the Jail.

6. The phase beginning with the second set of *Miranda* warnings at the Jail.

*1. The Traffic Stop*

The State has the burden to prove that Sgt. Ferriter's stop of the Defendant's truck was based on the officer's suspicion of a violation of law, that the suspicion was articulable—meaning more than a mere hunch—and that the suspicion was objectively reasonable.

An investigatory stop is justified "if at the time of the stop the officer has 'an articulable suspicion that [a violation of law] has taken place, is occurring, or imminently will occur, and the officer's assessment of the existence of specific and

8

articulable facts sufficient to warrant the stop is objectively reasonable in the totality of the circumstances.'" *State v. Tarvers*, 1998 ME 64, ¶3, 709 A.2d 726, 727 (quoting *State v. Nelson*, 638 A.2d 720, 722 (Me. 1994) and *State v. Dulac*, 600 A.2d 1121, 1122 (Me. 1992)).

Sgt. Ferriter stopped the Defendant's vehicle based on his actual suspicion that the vehicle had committed the offense of leaving the scene of an accident, so the question becomes whether his suspicion was objectively reasonable.

Here, three different facts support the State's position.

First, the Defendant's truck was the only vehicle Sgt. Ferriter saw approaching his vehicle.

Second, the Defendant's vehicle was reasonably consistent with the description given of the truck that had left the scene. At night, the Defendant's truck could have appeared dark in color both to the person who gave the initial description and to Sgt. Ferriter. The fact that the Defendant's vehicle was not "lifted" does not exclude it because the description indicated that the truck involved in the accident was "possibly lifted." The facts that the Defendant's truck was dented and that the description did not mention dents likewise do not exclude Defendant's truck.

Third, Sgt. Ferriter observed erratic operation—the Defendant's truck slowing almost to a stop in the road for no reason and then resuming normal speed—which could reasonably be taken as indicating impaired operation.

The stop of Defendant's truck was based on Sgt. Ferriter's actual suspicion that Defendant's truck had violated the law by leaving the scene of an accident and also that the driver might be impaired. The suspicion was articulable and objectively reasonable. Accordingly, the State has met its burden to justify the stop of the Defendant's vehicle.

### 2. *The Conversation While Defendant was Inside His Truck*

Defendant does not contend that he was in custody while sitting inside his truck and there is nothing about this phase of the interaction that would render Sgt. Ferriter's questioning of Defendant custodial interrogation. All of the Defendant's answers as well as his spontaneously volunteered statements during this phase are admissible.

### 3. *Interrogation While Defendant Was Handcuffed and Outside his Truck*

The Defendant contends that he was in custody after being removed from his vehicle and handcuffed and that his responses to questions should be excluded accordingly.

"In order for statements made prior to a *Miranda* warning to be admissible, the State must prove, by a preponderance of the evidence, that the statements were made while the person was not in custody, or was not subject to interrogation." *State v. Hassan*, 2007 ME 77, ¶ 13, 925 A.2d 625, 628 (quotation marks and emphasis omitted).

10

"[W]hether a suspect was in custody at the time of an interrogation depends upon whether a reasonable person in the suspect's circumstances would have felt that he or she was subject to 'formal arrest or restraint on freedom of movement' [to] the degree associated with formal arrest.' *State v. Holloway*, 2000 ME 172, ¶ 14, 760 A.2d 223, 228 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)).

The Law Court has prescribed a 10-factor test for determining whether interrogation is custodial in nature. *See State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226. The factors, phrased below as they are in *Michaud*, and this court's analysis of each in the context of this case, are as follows:

(1) The locale where the defendant made the statement: The location was at the side of a public road Defendant had entered voluntarily. This factor weighs in favor of the State.

(2) The party who initiated the contact: Sgt. Ferriter initiated contact. This factor weighs against the State.

(3) The existence or non-existence of probable cause to arrest (to the extent communicated to the defendant): Sgt. Ferriter did not make any statement indicating he believed there was probable cause to arrest the Defendant, although, as discussed below, his actions could reasonably be taken to indicate such a belief on his part. This factor is neutral.

(4) Subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave: Once the Defendant was placed in handcuffs, a reasonable person in the Defendant's situation would have plainly understood from the officer's questions and actions that he was not free to leave. That does not necessarily mean the Defendant was in custody. However, the Defendant was not told why he was being handcuffed and he also knew he had just admitted to having consumed alcoholic beverages and to

11

having possibly have hit someone with his truck. A reasonable person would take the unexplained decision to pull him out of his vehicle and immediately place him in handcuffs as indicating a subjective view on the officer's part that Defendant needed to be restrained to an extent associated with formal arrest. This factor weighs against the State.

(5) Subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave: As noted above, the officer's decision to remove the Defendant and put him in handcuffs just after Defendant had made inculpatory admissions and without any statement about the Defendant not being under arrest would cause a reasonable person to believe he was not free to leave and being restrained to a degree associated with formal arrest. This factor weighs against the State.

(6) The focus of the investigation (as a reasonable person in the defendant's position would perceive it): Clearly the focus of the stop and Sgt. Ferriter's questioning was on the Defendant. This factor weighs against the State.

(7) Whether the suspect was questioned in familiar surroundings: As mentioned with regard to the locale factor, the questioning took place on a road that the Defendant had entered upon voluntarily, but there is no evidence that the Defendant had traveled the road before. This factor weighs against the State.

(8) The number of law enforcement officers present: Two officers were at the scene when the Defendant was placed in handcuffs. This factor weighs against the State.

(9) The degree of physical restraint placed upon the suspect: Because physical restraint is typically associated with being in custody, the presence or absence of physical restraint during questioning is usually deserving of substantial weight in the analysis. For reasons noted above, this factor weighs against the State.

10) The duration and character of the interrogation: The record does not enable the court to establish, with any exactitude, the duration of the period between the point the Defendant was placed in handcuffs and the point at which he was given *Miranda* warnings in the cruiser. However, it was measured in minutes, not hours. There is no evidence that the questioning was coercive or threatening. This factor weighs in favor of the State.

12

None of the ten factors is dispositive, and the weight that each receives in the balance depends on the circumstances of the case at hand. Based on all of the factors and the entire motion record, the court concludes the State has not met its burden to show by a preponderance of the evidence that the Defendant was not in custody between the point he was handcuffed and the point at which he was placed inside Sgt. Ferriter's vehicle.

The officers plainly had a valid and good faith reason for handcuffing the Defendant based on their legitimate concern for their safety based on what appeared to be the Defendant's efforts to reach for something in his vehicle. The officers also had good reason to pull the Defendant out of his truck, based on his failure to comply with the directive to step outside. However, the officers' subjective reasons for taking the actions they did are not controlling. The test is whether a reasonable person in the Defendant's situation would consider themselves under arrest or under formal restraint on their freedom of movement to the degree associated with formal arrest. *State v. Holloway, supra,* 2000 ME 172 at ¶ 14, 760 A.2d 223, 228.

Here, just after having admitted to having consumed alcoholic beverages and to having possibly hit someone, the Defendant was pulled out of his truck and immediately placed in handcuffs and made to sit on the rear bumper of his truck, without being told why or that he was not under arrest. A reasonable person in these circumstances would consider themselves as being placed under or arrest or

13

at least having their freedom of movement limited to the extent associated with being placed under arrest.

Accordingly, all inculpatory statements made in response to interrogation during this period are excluded.

4. *Interrogation Inside Sgt. Ferriter's Vehicle*

Defendant continued to be in custody inside Sgt. Ferriter's vehicle.

The issue generated during this phase is whether Sgt. Ferriter's recitation of *Miranda* warnings while he and the Defendant were sitting inside Sgt. Ferriter's vehicle was sufficient to render Defendant's waiver of his *Miranda* rights a knowing, voluntary and intelligent one.

Initially, it should be clear that the fact that the Defendant told Sgt. Ferriter that he knew his rights is irrelevant. People who claim to know their rights still must be given the required *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. at 468 ("The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given.")

The portion of *Miranda* omitted from Sgt. Ferriter's warning was that anything the Defendant said could be used against him in a court of law. This

warning is an essential component of the *Miranda* warnings.    In its *Miranda* opinion, the Supreme Court said:

> The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system -- that he is not in the presence of persons acting solely in his interest.

384 U.S. at 469.

The State argues that the Supreme Court has not required exact adherence to the required *Miranda* warnings, pointing to *Michigan v. Tucker*, in which the Court decided that a person's responses to custodial interrogation were admissible although the person had not been advised that an attorney would be appointed for him if he were indigent. 417 U.S. 433, 450-52 (1974). The *Tucker* decision is distinguishable from this case.

First, as the Court in *Tucker* noted, the custodial interrogation at issue occurred before the Court's decision in *Miranda v. Arizona*. *See* 417 U.S. at 447 ("We consider it significant to our decision in this case that the officers' failure to advise respondent of his right to appointed counsel occurred prior to the decision in *Miranda*."). Second, the omitted warning in *Tucker* involved a Sixth

Amendment right to counsel, not the consequences of a waiver of the Fifth Amendment right to remain silent.

No one can be deemed to have made a knowing and intelligent waiver of the right to remain silent without being informed that, if they do waive the right, anything they say can be used against them in court. Thus, the Defendant's statements in response to questions inside Sgt. Ferriter's vehicle were not the product of a valid waiver of Defendant's Fifth Amendment right to remain silent. All statements made by Defendant in response to Sgt. Ferriter's questioning inside the cruiser are excluded.

Defendant's statement—""I knew I'd hit somebody, I turned around and came back to help 'em out"—was spontaneous and not in response to any question, and therefore is not excluded.

5. *The Drive to the Jail*

There is no evidence that interrogation occurred during the journey to the Cumberland County Jail, but also it did not appear from Sgt. Ferriter's testimony that the Defendant made inculpatory statements during the trip.

6. *Custodial Interrogation at the Jail*

At the Jail, Sgt. Ferriter again administered the warnings required by *Miranda* and again the Defendant waived his right to remain silent. The *Miranda* warnings were sufficient and Defendant's waiver was knowing and intelligent.

16

Although neither party has raised the issue, the court has considered whether the Defendant's waiver could be deemed tainted under the "cat out of the bag" theory. *See Missouri v. Seibert,* 542 U.S. 600 (2004); *State v. Nightingale,* 2012 ME 132 at ¶29, 58 A.3d 1057.

Based on the totality of the circumstances, the court finds and concludes that the State has met its burden to prove that the procedure followed by the officers here "was not deliberately employed to undermine the efficacy of the *Miranda* warnings." *State v. Nightingale,* 2012 ME 132 at ¶29, 58 A.3d 1057.

Facts within the totality that are particularly relevant to this conclusion are: the fact that the Defendant was handcuffed on being removed from his vehicle resulted from the officers' valid and good faith concern for their own safety; the brief duration of the questioning while Defendant was still in his truck and while he was in Sgt. Ferriter's vehicle; the Defendant's spontaneous voluntary statements at various points; his willingness throughout to answer questions, and the fact that at no time during the interrogation at the Jail did Sgt. Ferriter refer back to the Defendant's prior responses at the scene or remind the Defendant of what he had said previously.

Defendant's answers to Sgt. Ferriter's questions are admissible.

IT IS ORDERED AS FOLLOWS:

1. Defendant's Motion to Suppress is granted in part and otherwise denied.

2. The Defendant's statements in response to interrogation starting with

the point at which he was placed in handcuffs and ending at the point at which he agreed to answer questions at Jail are hereby excluded.

3.   Defendant's responses to questions prior to being handcuffed are not excluded.

4.   Defendant's responses to questions asked at the Jail are not excluded.

Dated October 3, 2019

_____

A. M. Horton, Justice