STATE OF MAINE                          UNIFIED CRIMINAL DOCKET
CUMBERLAND, ss                          No. CR-19-3312

STATE OF MAINE

STATE OF MAINE
Cumberland, ss, Clerk's Office

JAN 02 2020
RECEIVED

v.                                      ORDER

KENNETH GRAYSON,

            Defendant

Before the court is defendant Kenneth Grayson's motion to suppress certain statements that he made during questioning by Portland Police Officer Ben Savage on May 7, 2019 on the ground that those statements were not voluntary. Specifically, Gray is seeking to suppress any statements he made after the first 13 minutes of his recorded interview (State's Ex. 3) as well as the written statement he made at the conclusion of the interview.

A hearing was held on the motion on November 14, 2019.

The court finds as follows:

Grayson is charged with criminal threatening with a dangerous weapon, alleged to have occurred on May 6, 2019. Specifically, Grayson is alleged to have confronted someone he believed had assaulted a friend of his and threatened to "gut" that individual while brandishing a knife.

On May 7, the day after the alleged threat was reported, Officer Savage determined that a possible suspect resided in Apartment 3-2 at 273 Cumberland Avenue, close to the site of the alleged event. Savage went to that apartment and spoke to the occupant, who was defendant

Entered on the Docket: 1-2-20

Grayson. After briefly speaking with Grayson at the building, Savage asked if Grayson would accompany him to the police station for an interview, and Grayson agreed.[1]

At the police station Savage led Grayson to an interview room, where their interaction was recorded on a video introduced as State's Ex. 3 at the hearing.[2] Initially, Savage left the room, telling Grayson he would be right back. Savage re-entered a minute later and told Grayson that he would have another officer stand by with him while he talked with his boss. The two exchanged some small talk and then Savage left, casually telling the other officer, "Keep an eye on him."

The other officer then appeared in the doorway and said in a friendly manner, "I'm babysitting you, I guess." Grayson responded that he was too tired to be much trouble. Throughout these interactions and in fact during the entire interview Grayson remained seated on a chair in the interview room in a relaxed posture, interacting with the officers in an affable manner and showing no signs of agitation or nervousness.

About 15 seconds later, without any questions or prompting by the officer, Grayson volunteered in a resigned tone that "the sad part is I knew this was coming yesterday." He followed that up by stating that he "had gone out and threatened a kid," adding that his actions had been provoked by a threat against persons he described as family. While Grayson was talking, the officer acknowledged Grayson's statements by saying "yeah" but did not follow up and then told Grayson he didn't know anything about it. Thereafter the officer retreated out of the doorway far enough to be out of camera range, and both were silent until Savage re-entered the room about three or four minutes later.

---

[1] Grayson testified at the suppression hearing that he "pretty much" knew why Savage wanted to talk to him.

[2] By agreement of counsel, only the first 16 minutes of that video was played at the hearing.

Savage then read Grayson his Miranda rights and Grayson firmly answered, "yes" when asked if he understood those rights, including the right to stop answering questions at any time. Grayson then stated that he was willing to answer questions.[3]

Savage then asked what Grayson remembered about the incident the previous day, and Grayson proceeded to calmly tell him that a friend named Cassandra had told him that several individuals had threatened and assaulted her. He had then learned that two of those individuals, a male and a female, were outside on the street, and he went outside to confront them.

He stated that he first told them to stay away from Cassandra or he would "fuck them up." He stated that the male had then began calling him names such as "pedophile" and "skinner." At that point he said he became angry, dropped his hand down as if he was going to hit the male, and told the male that he was "going to fucking gut you." He said the interaction had ended with the couple leaving.

Savage told him that the incident had taken place within view of a security camera at Portland High School (which was not true), that Savage had looked at the footage, and that the camera showed that there was something in Grayson's hand. Grayson responded that it was just his phone and reached into his pocket to display a small cellphone.

At approximately the 13 minute mark of the recorded interview, Savage responded that it looked bigger than a phone. Savage then said, "I'm giving you a chance to be honest. I'm not going to take you to jail. The worst that's going to come out of this whole situation is you walk out of here with a summons." Grayson, responded, "Okay."

---

[3] Grayson also responded affirmatively when asked if he had been read his rights previously. He subsequently signed a written confirmation of his Miranda waiver (admitted as State's Ex. 2 at the hearing).

Savage then repeated that Grayson needed to be honest and suggested that he thought Grayson was not being truthful. At that point Grayson interjected that he did not want to "go back to jail."

Savage continued that he understood people have to stick up for their friends but he wanted the truth. He stated that he knew and Grayson knew that Grayson wasn't just holding a cellphone. He then asked Grayson to tell him again what happened and said he wanted Grayson to be truthful "or else the summons is off the table." At that point Grayson, still very calm, said everything he had said before had been true except that he had a pocketknife.

Officer Savage subsequently wrote out a statement for Grayson to sign. (State's Ex. 2). The written statement included an acknowledgment that Grayson had a knife in his hand when he told the male that he would "gut" him. In setting forth what had happened, the written statement adheres closely to what Grayson had said in his oral responses to Savage's questions. The first sentence of that statement reads as follows, "My name is Kenneth Grayson and this statement is voluntary." Grayson signed and initialed the statement. Thereafter Grayson received a summons charging him with criminal threatening with a dangerous weapon.

The defense argues that once Savage told Grayson that he wanted the truth or the summons was "off the table," Grayson's statements became involuntary and that all of his statements after that point should be suppressed.

On the issue of voluntariness, the State bears the burden of proof of establishing voluntariness beyond a reasonable doubt. *E.g., State v. Coombs*, 1998 ME 1 ¶ 10, 704 A.2d 387. A defendant's statements are voluntary if they result from the free choice of a rational mind, are not the product of coercive police conduct, and if under all the circumstances, the admission of those statements at trial would be fundamentally fair. *Id.*

4

The Law Court has stated that a determination as to voluntariness requires consideration

of the totality of the circumstances, including

> The details of the interrogation; duration of the interrogation;
> location of the interrogation; whether the interrogation was
> custodial; the recitation of *Miranda* warnings; the number of
> officers involved; the persistence of the officers; police trickery;
> threats, promises or inducements made to the defendant; and the
> defendant's age, physical and mental health; emotional stability, and
> conduct.

*E.g., State v. Hunt,* 2016 ME 172 ¶ 36, 151 A.3d 911.

At the outset, the court does not find that defendant's mental or emotional state was in any

way impaired. Throughout the interview, even in ultimately admitting that he had been displaying

a knife, defendant was very calm, and his responses were coherent and thoughtful.[4] The court does

not find any question as to whether Grayson's statements were the product of a rational mind.

In addition, the court does not find that Savage's untrue statements about security camera

footage raise any question as to voluntariness. Law enforcement agents are allowed to make untrue

statements as to potential evidence – even though those qualify as "police trickery" – in an effort

to see if suspects will change their stories. *See, e.g., State v. Nightingale,* 2012 ME 132 ¶ 7 (untrue

statements described as "realistic bluffs"); *id.* ¶ 32 ("We have recognized the practical necessity

for the use of deception in criminal investigations"); *United States v. Byram,* 145 F.3d 405, 408

(1st Cir. 1998) ("police commonly engage in such ruses as suggesting to a suspect that a

confederate has just confessed or that police have or will secure physical evidence against the

---

[4] Grayson testified at the motion to suppress, and while the court credits certain aspects of his testimony as discussed below, it does not credit that testimony to the extent that it suggests that Grayson's statements to Savage were in any way affected by any mental health issues. The court also does not credit Grayson's testimony that he only told Savage he had a knife because he thought that was what Savage wanted to hear. This testimony appeared to be calculated to allow Grayson to disavow the statement if it was not suppressed.

suspect"). As the Law Court stated in *Nightingale,* a different rule applies if police deception relates to a suspect's constitutional rights. 2012 ME ¶ 32. No such deception was involved here.

As the defense effectively recognized in only seeking to suppress Grayson's statements after the first 13 minutes of the interview,[5] the only issue as to voluntariness arises from the colloquy between Savage and Grayson on whether a summons would be issued or whether it would be taken off the table. The court credits Grayson's testimony that in light of his prior incarceration he had a particular aversion to jail, evidenced by Grayson's interjection to that effect during the interview. It also finds that whether or not the interview was fully custodial, it was sufficiently custodial – because of the *Miranda* warning and the other officer "babysitting" Grayson while Savage left the room – so that Grayson (who had experience with the criminal justice system) would at least have wondered whether he was about to be arrested.

Finally, and crucially, it finds that Officer Savage's initial statement that Grayson would at worst receive a summons, followed by his later statement that unless Grayson told the truth, the summons was "off the table," raises a reasonable doubt as to voluntariness. This is true given Grayson's particular aversion to jail. The existence of reasonable doubt is not dispelled by Grayson's signature on the written statement that it was voluntary. Savage wrote the statement, and it is not clear that Grayson focused on those words in signing the statement or intended to disclaim that he had felt coerced. Under the specific circumstances presented, the State has not proven that it is almost certainly true that Grayson's admission that he had a knife rather than a phone was not the product of coercive police conduct.

---

[5] It is the court's understanding that the defense is not seeking to suppress Grayson's statement that he had a phone in his hand or his display of that phone, recorded at around 12:59 on State's Ex. 3. Even if the defense were to challenge that portion of the interview, the court would not suppress those statements because up through that portion of the questioning the court finds beyond a reasonable doubt that Grayson's statements were voluntary.

6

As a result, the court grants defendant's motion to suppress as to any statements made by defendant during the May 7, 2019 interview from the point when Officer Savage indicated he did not accept defendant's statement that he had only a phone in his hand.

Dated: January 2 , 2020

Thomas D. Warren
Justice, Superior Court