MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2014 ME 94
Docket:      Wal-12-522
Argued:      April 7, 2014
Decided:     July 22, 2014

Panel:       SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

## STATE OF MAINE

v.

## LUKE A. BRYANT

SILVER, J.

[¶1]  Luke A. Bryant appeals from a judgment of conviction of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2013), entered in the trial court (*R. Murray, J.*) following a jury trial.  Bryant contends that the court erred in denying his motion to suppress statements he made during an interview with police following a shooting at his residence.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  "We view the record in a light most favorable to support the court's order on the motion to suppress, and find that the record supports the following facts."  *State v. Bailey*, 2012 ME 55, ¶ 3, 41 A.3d 535.  On the evening of February 19, 2011, Detective Jason Bosco of the Waldo County Sheriff's Department responded to reports of a shooting at Bryant's residence.  Bosco arrived at the scene and soon learned that an individual had been killed by what

appeared to be an accidental discharge of a shotgun. Bosco asked Bryant if he would be willing to speak with him about what had happened. Bryant agreed. They then engaged in a fifteen-minute-long, audio-recorded interview in a bedroom in Bryant's apartment. Bosco testified that the focus of the interview was to investigate what he believed to be an accidental shooting, and that he had no probable cause to arrest Bryant at that time. Bosco was not in uniform, did not physically restrain Bryant, was non-confrontational, and did not inform Bryant that he was under arrest or that he was not free to leave. Bryant remained calm throughout the interview.

[¶3] Later that evening, Detective Jason Andrews of the Maine State Police arrived at the residence in plain clothes, met Bryant, and observed that Bryant was visibly upset. After obtaining Bryant's consent to search the apartment, Andrews asked Bryant if he would speak with him further. Andrews repeatedly informed Bryant that he was not under arrest, was not required to speak with Andrews, and was free to leave at any time. Bryant acknowledged that he understood and agreed to speak with Andrews. After Bryant expressed a desire to leave the apartment, Andrews suggested that they continue the interview in Andrews's unmarked police cruiser. Bryant agreed. Bosco was also present for much of the interview in the cruiser, which lasted approximately two hours, was audio-recorded, and was non-confrontational. At no point during the interview did Bryant or the detectives

raise their voices. Bryant remained calm and provided responsive and focused statements. A number of times throughout the interview, Andrews told Bryant that he was free to leave at any time.

[¶4] During the interview in the cruiser, the detectives repeatedly asked Bryant to return to the apartment to participate in a reenactment of the shooting. Bryant was initially unwilling to go back inside, but after the detectives informed him that the victim's body had been removed from the apartment, he agreed to go inside. The detectives and Bryant returned to the scene of the shooting and conducted a walk-through that lasted approximately twenty-five minutes and was video-recorded.

[¶5] At the conclusion of the interview, Bryant left the residence with friends. At no time during the various interviews did any police officer provide Bryant with *Miranda* warnings.

[¶6] On May 20, 2011, the Waldo County Grand Jury returned an indictment charging Bryant with manslaughter in violation of 17-A M.R.S. § 203(1)(A). Bryant pleaded not guilty at arraignment. He later moved to suppress the statements he had made to Bosco and Andrews on February 19, 2011.[1] Bryant argued that his statements were made in the course of

---

[1] The recorded conversations between Bryant and the detectives focused in large part on the detectives' questions regarding whether Bryant shot the victim while fooling around. Based on information received from the victim's girlfriend, the detectives questioned Bryant about a "scare game" that he and the victim would play in which they would point unloaded guns at each other. The State

4

custodial interrogation without having received *Miranda* warnings, and that his emotional state rendered his statements involuntary.[2] The court held an evidentiary hearing on Bryant's motion. The State presented the detectives' testimony and introduced audio and video recordings of the interviews. Following the hearing, the court entered an order denying Bryant's motion to suppress, concluding that Bryant was not in custody and that his statements were voluntarily given.

[¶7] At trial, the State introduced the audio and video recordings of the interviews. After a three-day trial, the jury returned a verdict finding Bryant guilty of manslaughter. The court sentenced Bryant to fifteen years in prison, with all but nine years suspended, and four years of probation. Bryant timely appealed.

## II. DISCUSSION

[¶8] Bryant contends that the trial court erred in denying his motion to suppress for two reasons: first, because he was subjected to custodial interrogation but did not receive *Miranda* warnings, and second, because he was in a state of shock and emotional distress that rendered his statements involuntary. We review the trial court's factual findings on a motion to suppress for clear error, and its ultimate determination regarding suppression de novo. *State v. Bragg*,

---

presented this theory of the case at trial. Bryant denied that the victim's death was a result of a "scare game" gone wrong, and stated that his hand had slipped on the trigger while he was clearing the gun at the moment that the victim walked into the room from the bathroom.

[2] Bryant's motion to suppress also requested that the court suppress evidence seized as a result of Bryant's consent to search his apartment, but Bryant later withdrew that aspect of his motion to suppress.

2012 ME 102, ¶ 8, 48 A.3d 769. Because Bryant does not challenge the court's factual findings, we need only review the court's ultimate legal conclusions that Bryant was not in custody and that he made his statements voluntarily. *See State v. Lowe*, 2013 ME 92, ¶¶ 13-14, 81 A.3d 360; *Bailey*, 2012 ME 55, ¶ 12, 41 A.3d 535.

A.    Whether Bryant's Statements Were Made in the Course of Custodial Interrogation

[¶9]    "A person who is in custody and subject to interrogation must be advised of the rights referred to in *Miranda v. Arizona* in order for statements made during the interrogation to be admissible against [him] as part of the State's direct case at trial." *State v. Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247; *see Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The State does not dispute that Bryant was "interrogated" for purposes of *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (defining "interrogation," for purposes of *Miranda*, as "express questioning or its functional equivalent"). Rather, the issue is whether Bryant was in custody when he made his statements to the police.

[¶10]    A subject is "in custody" if he is subjected to either (1) a formal arrest (which the parties agree was not the case here), or (2) "a restraint on freedom of movement to the degree associated with a formal arrest." *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222 (quotation marks omitted) (alteration omitted). To determine whether Bryant was restrained to the degree associated with a formal

arrest, we ask "whether a reasonable person, standing in the defendant's shoes, would have felt he or she was not at liberty to terminate the interrogation and leave." *Bragg*, 2012 ME 102, ¶ 8, 48 A.3d 769 (quotation marks omitted). In making this objective determination, we consider various factors, viewing them in their totality:

(1)    the locale where the defendant made the statements;

(2)    the party who initiated the contact;

(3)    the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4)    subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5)    subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6)    the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7)    whether the suspect was questioned in familiar surroundings;

(8)    the number of law enforcement officers present;

(9)    the degree of physical restraint placed upon the suspect; and

(10)   the duration and character of the interrogation.

*Michaud,* 1998 ME 251, ¶ 4, 724 A.2d 1222; *see also State v. Jones*, 2012 ME 126, ¶ 22, 55 A.3d 432 ("We consider these factors in their totality, not in isolation." (quotation marks omitted)).

[¶11]  The totality of the factors establishes that Bryant was not in custody at any point during the interview conducted in the bedroom by Bosco, the interview conducted in the cruiser by Bosco and Andrews, or the walk-through reenactment in the apartment.  Throughout the interviews, the detectives repeatedly asked Bryant's permission to speak with him, and Bryant repeatedly consented.  *See State v. Nightingale*, 2012 ME 132, ¶ 17, 58 A.3d 1057 (suspect was not in custody where he voluntarily participated in an interview with police), *cert. denied*, 133 S.Ct. 2798 (2013); *State v. Nadeau*, 2010 ME 71, ¶ 55, 1 A.3d 445 (suspect was not in custody in his dorm room where he consented to the police's request to enter his room).  The detectives did not physically restrain Bryant, *see State v. Bleyl*, 435 A.2d 1349, 1358-59 (Me. 1981) (lack of restraint on defendant at the time of questioning is relevant to custody determination), and they repeatedly told Bryant that he was not under arrest and was free to terminate the conversation and leave at any time; in fact, Bryant did leave at the end of the interviews, *see Nightingale*, 2012 ME 132, ¶¶ 17-18, 58 A.3d 1057 (suspect was not in custody where the police informed him that he could terminate the interview at any time, and where the suspect did terminate the interview).  Both the detectives and Bryant

remained calm and non-confrontational throughout the entire encounter. *See Nadeau*, 2010 ME 71, ¶ 55, 1 A.3d 445 (suspect was not in custody where the police officers' interview style was "relatively low-key and non-confrontational").

[¶12] Other factors that weigh against a finding of custody include that there were no more than two plainclothes police officers present with Bryant at any given time, *see Jones*, 2012 ME 126, ¶¶ 22-24, 55 A.3d 432 (the number of law enforcement officers present and the fact that they wore plain clothes is relevant to the court's custody determination), and that the interviews took place either inside Bryant's residence or immediately outside it in the police cruiser after Bryant asked to leave the apartment, *see State v. Williams*, 2011 ME 36, ¶ 8, 15 A.3d 753 (suspect was not in custody where he was interviewed in a police cruiser within yards of his home, as the suspect was "familiar with the surroundings"). Furthermore, the detectives indicated to Bryant that the focus of the investigation was to investigate what was believed to be an accidental shooting, and that they did not then have probable cause to arrest Bryant. *See Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222 (relevant factors include the focus of the investigation, the non-existence of probable cause to arrest the suspect, and the subjective beliefs of the police, to the extent that these are manifested to the suspect and would affect a reasonable person in the defendant's position); *cf. State v. Holloway*, 2000 ME 172, ¶¶ 20-23, 760 A.2d 223 (concluding that Holloway was in custody

where the police never informed Holloway that he was free to leave; the questions posed by the police were confrontational and accusatory; Holloway was informed that he was a prime suspect and was accused of committing the murder and lying about it; and the police rejected Holloway's request that the interrogation end so that he could contact an attorney).

[¶13]   Bryant's contentions that he was in custody are unavailing.   In particular, Bryant contends that while he spoke with Bosco in the bedroom in Bryant's apartment, "another officer remained just outside their bedroom obviously acting as a sentinel with the clear message that [Bryant] was remaining in the room."   Although the record before the motion court indicates that an officer was present outside Bryant's bedroom between Bosco's interview and Andrews's arrival, Bryant's assertion that this officer acted as a "sentinel" is not supported by competent record evidence.   Rather, it is undisputed that it was Bryant's decision to speak in the bedroom and that Bosco and Bryant conversed alone in the room with the door open.   Similarly, Bryant's assertion that the detectives "badgered" him into returning to the apartment to conduct the walk-through is not supported by competent evidence.   The detectives' requests for Bryant to participate in the walk-through were entirely calm and conversational, and Bryant displayed an eagerness to assist the detectives in their investigation.   *See State v. Higgins*, 2002 ME 77, ¶¶ 14-18, 796 A.2d 50 (concluding that an interrogation was

non-custodial where the defendant's demeanor and conduct throughout his interrogation manifested a desire to cooperate and answer the detectives' questions).

[¶14] Accordingly, because there was no point at which a reasonable person standing in Bryant's shoes would have felt that he or she was not free to terminate the interrogation and leave, the court did not err in concluding that Bryant was not in custody for purposes of *Miranda*.

B.    Whether Bryant's Statements to the Police Were Made Voluntarily

[¶15]    Bryant next contends that his statements to Detectives Bosco and Andrews were not made voluntarily because he was in a state of shock and extreme distress. The State bears the burden of proving voluntariness beyond a reasonable doubt. *State v. Dion*, 2007 ME 87, ¶ 33, 928 A.2d 746. The determination of whether a statement is voluntary is a mixed question of fact and law, such that the court's factual findings are reviewed for clear error and its application of legal principles to those findings is reviewed de novo. *Id.* ¶ 32. Although we have stated that the question of whether a confession is voluntary is "primarily a question of fact," *State v. Gould*, 2012 ME 60, ¶ 11, 43 A.3d 952 (quotation marks omitted), we have also explained that when the court's factual findings underlying its voluntariness determination are undisputed, we provide independent de novo review of the court's ultimate determination regarding

voluntariness, *State v. Coombs*, 1998 ME 1, ¶¶ 8-9, 704 A.2d 387. Accordingly, because Bryant does not dispute the court's factual findings, we review de novo the court's determination that Bryant's statements were voluntary.

[¶16] "To be voluntary, a confession must be the free choice of a rational mind, fundamentally fair, and not a product of coercive police conduct." *Nightingale*, 2012 ME 132, ¶ 33, 58 A.3d 1057 (quotation marks omitted). In deciding whether a statement was voluntary, we consider the totality of the circumstances, including

> both external and internal factors, such as: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173.

[¶17] Here, the totality of the circumstances establishes beyond a reasonable doubt that Bryant's statements to Bosco and Andrews were made voluntarily. As discussed above, the questioning that occurred throughout the three interviews was non-confrontational and took place in a familiar, non-custodial setting. *See State v. Lavoie*, 2010 ME 76, ¶ 19, 1 A.3d 408 (defendant's statements were voluntary where the defendant agreed to speak with the police and neither officer examining the defendant was in uniform or wore a visible weapon); *Nadeau*, 2010 ME 71,

¶ 57, 1 A.3d 445 (the absence of threats or physical force by the police weighs against a finding that the defendant's statements, which were made in a non-custodial setting, were involuntary). The detectives obtained Bryant's permission before conducting each interview, and did not trick Bryant or make promises of leniency in order to obtain his statements. *See Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173; *see also State v. McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335 (distinguishing a voluntary statement from one that "results from threats, promises[,] or inducements" (quotation marks omitted)).

[¶18] Moreover, the record does not support Bryant's assertion that he was in a state of shock and emotional distress that rendered his statements involuntary. Although Bosco testified at the motion hearing that Bryant appeared "visibly shaken" when Bosco first arrived at the residence, Bryant remained calm and composed throughout the interviews with the detectives and provided responsive and focused answers to their questions. At one point, Andrews actually observed that Bryant appeared to be in shock, to which Bryant responded that he is not an emotional person. In any event, to the extent that Bryant was emotionally distressed by the shooting that had occurred, there is no evidence that such distress rose to the level of mental or emotional instability required to render his statements involuntary. *See Lowe*, 2013 ME 92, ¶¶ 1, 3-8, 22-24, 81 A.3d 360 (upholding the court's determination that the defendant's statements were made voluntarily while

the defendant was in a hospital bed, had suffered serious injuries, had been sedated, and, upon being informed of the death of her friends, cried uncontrollably); *Coombs*, 1998 ME 1, ¶¶ 5-6, 12, 704 A.2d 387 (concluding that the fact that the defendant was crying and upset during the interrogation, without more, did not render her statements involuntary); *State v. Philbrick,* 481 A.2d 488, 494 (Me. 1984) (concluding that a confession, made while the defendant was traumatized from the victim's shooting, was voluntary); *cf. State v. Rees*, 2000 ME 55, ¶¶ 1-2, 748 A.2d 976 (upholding the suppression of statements made by defendant, who suffered from dementia).

[¶19] Accordingly, the totality of the circumstances demonstrates beyond a reasonable doubt that Bryant's statements were the free choice of a rational mind, were fundamentally fair, and were not a product of coercive police conduct. *See Nightingale*, 2012 ME 132, ¶ 33, 58 A.3d 1057. The court therefore did not err in determining that the statements were voluntary.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Steven C. Peterson, Esq., West Rockport, for appellant Luke A. Bryant

Janet T. Mills, Attorney General, and Lauren F. LaRochelle, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Steven C. Peterson, Esq., for appellant Luke A. Bryant

Lauren F. LaRochelle, Asst. Atty. Gen., for appellee State of Maine

Waldo County Superior Court docket number CR-2011-57
FOR CLERK REFERENCE ONLY