MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2015 ME 45
Docket:       Kno-14-118, SRP-14-117
Argued:       February 10, 2015
Decided:      April 30, 2015

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.

STATE OF MAINE

v.

ANDREW J. KIERSTEAD

JABAR, J.

[¶1]  Andrew J. Kierstead appeals from a judgment of conviction of murder, 17-A M.R.S. § 201(1)(A) (2014), entered in the trial court (*Hjelm, J.*) after a jury trial.  Kierstead argues that the court erred in denying his motion to suppress statements he made to law enforcement officers in the hours following the murder.[1]  Finding no error, we affirm the judgment.

## I.  FACTS

[¶2]  On October 10, 2012, a Knox County Grand Jury returned an indictment charging Kierstead with knowing or intentional murder.  17-A M.R.S. § 201(1)(A).  Kierstead pleaded not guilty, and moved to suppress the statements he had made on September 27, claiming that they were involuntary due to his

---

[1]  The sentence review panel has granted Kierstead's application to allow an appeal of his sentence, and Kierstead argues that the court erred or abused its discretion in setting his forty-five-year prison sentence.  We find no error in the court's sentencing decision pursuant to 17-A M.R.S. § 1252-C(1)-(2) (2014), and therefore affirm the sentence.

2

intoxication and emotional state at the time.[2]  We view the evidence in the light most favorable to the court's order.  *State v. Collier*, 2013 ME 44, ¶ 2, 66 A.3d 563.

[¶3]  On September 27, 2012, Kierstead went to Richard Mills's house to buy methadone, which he regularly purchased illegally from Mills.  Kierstead had been drinking alcohol since early that morning, and he continued to drink at Mills's house.  After Mills refused to provide Kierstead with methadone because Kierstead owed him money from prior drug purchases, Kierstead lured Mills outside on the pretext that he needed help with his truck.  Kierstead shot Mills with a twelve-gauge pump-action shotgun several times at close range, including four times in the back.  After the shooting, Kierstead swallowed Mills's Vicodin pills in an attempt to commit suicide.

[¶4]  After ingesting the pills and passing out for a period of time, Kierstead awoke and called 9-1-1.  He reported to the dispatcher that he had shot and killed his friend, whose body was in the driveway.  Kierstead provided an address for his location as well as a description of the property, and reported that he had tried to commit suicide by overdosing on pills.  The dispatcher instructed Kierstead to go out on the porch and wait for police to arrive.  Throughout the twelve-minute call,

---

[2]  Kierstead did not contend that his statements were involuntary as a result of police coercion or improper state action.

Kierstead was "calm but upset," repeatedly saying things to the effect of, "I can't believe this happened," and, "I ruined my life." He did not slur his speech or demonstrate any other signs of intoxication.

[¶5] Officer Kirk Guerrette of the Knox County Sheriff's Department responded to the address Kierstead had provided, and found Kierstead sitting on the porch and talking on the phone. Following Guerrette's instructions, Kierstead put his hands behind his back and, without stumbling or falling, began walking backward toward Guerrette. Guerrette asked where Mills was and how long he had been there, and Kierstead responded coherently and without slurring. Kierstead stood upright without difficulty during a pat-down search, was able to walk normally and unassisted, and was calm and compliant.

[¶6] The emergency medical technicians who evaluated Kierstead while he sat in the back of a police cruiser asked him several questions to determine his alertness, and Kierstead responded appropriately to each question. An emergency medical technician also took Kierstead's vitals, which, except for an elevated pulse, were all normal. At one point, Kierstead stood up so that his blood pressure could be tested, and he did not stagger or fall in doing so. Kierstead was alert and responsive throughout the evaluations, and did not nod off or slur his speech. Though one emergency medical technician described him as "in shock" or

4

"stunned," no one who evaluated Kierstead believed him to be in need of medical care.

[¶7]  Detective Reginald Walker of the Knox County Sheriff's Department conducted an audio-recorded interview of Kierstead at the scene.  Walker, who at no point told Kierstead that he had to speak with him, read Kierstead his *Miranda* rights, each of which Kierstead indicated he understood before agreeing to speak with Walker.  Kierstead provided details about the shooting and also expressed his regret for shooting Mills.  Throughout the nonconfrontational interview, Kierstead was soft-spoken, but calm, coherent, and mostly responsive.  Although at times he did not immediately respond to certain questions, Walker was able to quickly regain his attention and resume his questioning.  At no point during the interview did Kierstead appear to lose consciousness.  Kierstead became emotional at times, particularly when he talked about the shooting.  He requested and was given water, and stated that he had not eaten in days but was not hungry.  At one point, Kierstead reported feeling nauseated and Walker let him step out of the car, which Kierstead had no apparent difficulty doing.  As Kierstead stood outside, Walker began talking with another officer about hunting, and Kierstead asked that they stop talking about guns and shooting things.

[¶8]  Maine State Police detective Jason Andrews also met Kierstead at the scene.  Kierstead, who recalled having spoken with Walker and being read his

*Miranda* rights, said he was willing to speak with Andrews but asked that they leave the scene. Andrews transferred Kierstead into his cruiser in order to bring him to the Rockland Police Department, and Kierstead had no difficulty standing or walking to Andrews's car. After Kierstead smoked a cigarette that Andrews had offered, he became nauseated and vomited.

[¶9] On the way to the police department, Kierstead spoke with Andrews about his job and where he lived. He spoke clearly, and did not nod off or fall asleep during the drive. Upon arriving at the police department, Kierstead drank more water and smoked another cigarette before again becoming ill and vomiting.

[¶10] Inside the police station, Detectives Andrews and Jackson conducted an audio-recorded interview of Kierstead. Kierstead was again informed of his *Miranda* rights, and he indicated that he understood them and was willing to speak with the detectives. The detectives were nonconfrontational and Kierstead agreed that they treated him fairly and did not compel him to make any statements. After coherently providing details about the shooting, Kierstead stated that he had tried to kill himself and that he still wished to die. As a result, and pursuant to standard booking procedure for an arrestee who indicates suicidal intentions, Kierstead was taken to Pen Bay Medical Center for a mental health evaluation.

[¶11] At the hospital, Dr. John Whitney Randolph examined Kierstead. Randolph concluded that Kierstead exhibited symptoms of toxic levels of

6

acetaminophen, which is found in Vicodin. He believed that Kierstead was at the lowest stage of acetaminophen overdose, which is characterized by an upset stomach. Randolph found that Kierstead's blood-alcohol level was .054%—a rate he believed sufficient to impair one's judgment. Extrapolating backward based on standard metabolic rates, he calculated that around the time Kierstead spoke with law enforcement officers the previous evening his blood-alcohol level might have been as high as .20%. At that level, Randolph opined, an individual may "slump over," lose consciousness and perhaps become comatose, and have difficulty talking.

[¶12] The court denied Kierstead's suppression motion based on its conclusion that his statements had been proved voluntary beyond a reasonable doubt. The court reasoned that, though there was evidence that Kierstead had consumed Vicodin, methadone, and alcohol on the day of the shooting, he did not display signs of heightened drug impairment or of actual significant impairment due to alcohol.

[¶13] After a four-day trial, the jury returned a verdict finding Kierstead guilty of murder. The court sentenced Kierstead to forty-five years in prison. Kierstead appealed to us.

## II. DISCUSSION

[¶14]  Kierstead contends that the court erred in denying his motion to suppress because after the shooting he was in a state of intoxication and emotional distress that rendered his statements involuntary.  "We review the trial court's factual findings on a motion to suppress for clear error, and its ultimate determination regarding suppression de novo."  *State v. Bryant*, 2014 ME 94, ¶ 8, 97 A.3d 595.  Because Kierstead does not challenge the court's factual findings, we review only the legal determination that his statements were made voluntarily and should not be suppressed.  *See id*.  We will uphold the "denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision."  *State v. Ormsby*, 2013 ME 88, ¶ 9, 81 A.3d 336 (quotation marks omitted).

[¶15]  In order for a statement to be voluntary, the State must establish beyond a reasonable doubt that it is "the free choice of a rational mind, fundamentally fair, and not a product of coercive police conduct."  *Bryant*, 2014 ME 94, ¶¶ 15-16, 97 A.3d 595.  In determining voluntariness, we consider the totality of the circumstances.  *Id* ¶ 16.  That a person is under the influence of drugs or in emotional distress does not, by itself, render a statement involuntary.  *See State v. Lowe*, 2013 ME 92, ¶ 22, 81 A.3d 360.  Rather, the particular circumstances of each case must be evaluated to determine whether a defendant's drug-related or emotional condition made him incapable of acting

voluntarily, knowingly, and intelligently. *See State v. Ashe*, 425 A.2d 191, 194 (Me. 1981); *State v. Coombs*, 1998 ME 1, ¶¶ 6, 12, 704 A.2d 387; *State v. Philbrick*, 481 A.2d 488, 494 (Me. 1984).

[¶16]   Here, the court did not err in finding that the totality of the circumstances establishes beyond a reasonable doubt that Kierstead's statements to law enforcement[3] were made voluntarily.  Though Kierstead exhibited some signs of a low-level acetaminophen overdose (specifically, nausea), and though there was objective evidence of Kierstead's alcohol consumption, there is abundant evidence that Kierstead's mental faculties were not significantly impaired at the time he made the statements in question.  This conclusion is supported not only by the detectives' testimony and the interrogation recordings, but also by the testimony of the 9-1-1 dispatcher and medical personnel who evaluated Kierstead that night.

[¶17]   Kierstead complied with the 9-1-1 dispatcher's instruction to go out on the porch and wait for police to arrive.  Each individual who evaluated Kierstead after the shooting described him as calm, cooperative, and lucid.  He never nodded off or otherwise appeared drowsy.  He at no point exhibited slurred

---

[3]   Though in its order on Kierstead's motion to suppress the trial court expressly considered Kierstead's statements to the 9-1-1 dispatcher, we decline to decide whether these statements were made to a law enforcement entity, and consider them only insofar as they are indicative of Kierstead's ability to act voluntarily, knowingly, and intelligently.

speech or difficulty with balance or ambulation. He spoke clearly and coherently, and at all times exhibited an awareness of his circumstances.

[¶18]   Moreover, Kierstead coherently and appropriately responded to the detectives' questions, and was able to provide specific details about the shooting and the events that led to it. He repeatedly affirmed that he understood his *Miranda* rights, and that he was willing to speak with police. Kierstead asked for water when he became thirsty, accepted a cigarette when he was offered one, asked two officers to refrain from a conversation about shooting guns, and said that he was hungry but did not want to eat. After a break in Walker's interrogation, Kierstead recalled Walker's name, and during the Rockland Police Department interview he recalled without hesitation Mills's cellular and home telephone numbers.

[¶19]   Although Kierstead appeared withdrawn or not immediately responsive at times, the court found that this was due to Kierstead's reflecting on the gravity of the situation. Likewise, although Kierstead's suicide attempt and his repeated statements that he wished to die may indicate irrationality or impaired decision-making, these actions and statements are properly viewed in the context of Kierstead's recognition of his circumstances. His stated suicidal intentions and occasional emotional breakdowns do not override the fact that he was consistently

alert, coherent, and responsive. *See Lowe*, 2013 ME 92, ¶¶ 22-25, 81 A.3d 360; *Philbrick*, 481 A.2d at 494.

[¶20] The record fully supports the court's determination that the totality of the circumstances demonstrated beyond a reasonable doubt that Kierstead's statements to law enforcement were the free choice of a rational mind, were fundamentally fair, and were not a product of coercive police conduct. *See Bryant*, 2014 ME 94, ¶ 19, 97 A.3d 595. The court did not err in determining that the statements were voluntary.

The entry is:

> Judgment of conviction affirmed. Sentence affirmed.

**On the briefs:**

Steven C. Peterson, Esq., West Rockport, for appellant Andrew J. Kierstead

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Steven C. Peterson, Esq., for appellant Andrew J. Kierstead

Donald W. Macomber, Asst. Atty. Gen., for appellee State of Maine

Knox Superior Court docket number CR-2012-265
FOR CLERK REFERENCE ONLY