STATE OF MAINE                                    UNIFIED CRIMINAL DOCKET

Cumberland, ss.

STATE OF MAINE                      )
                                    )
        v.                          )
                                    )
SAMUEL WHITNEY                      )          Docket No. CUMCD-CR-18-5909
                                    )
        Defendant                   )

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS
## AND STATE'S MOTION TO REOPEN RECORD

Defendant Samuel Bailey-Blair Whitney is charged in this case with the Class

D offense of Threatening Display of Firearm, 25 M.R.S. §§ 2001-A(1)(A), 2004(2).

Defendant's Motion to Suppress came before the court June 27, 2019 for an evidentiary

hearing.

The witnesses at the suppression hearing were Sgt. Christopher Farley and

Trooper James Leonard of the Maine State Police.

A disc containing audio and video of the traffic stop of the Defendant's vehicle

was admitted as State's Ex. 1.   State's Ex. 1 contains three data files, two from Sgt.

Farley's cruiser and one from Tr. Leonard's cruiser:

- The data file labeled on the disc as Christopher Farley_20180725_04_08_
  Troop -B_Traffic Arrest_40576317 Camera1.mp4  contains video from Sgt.
  Farley's forward facing cruiser camera and audio from Sgt. Farley's body
  microphone.  This data file is referred to herein as Farley Camera 1.

- The data file labeled on the disc as Christopher Farley_20180725_04_08_

1

Troop -B_Traffic Arrest_40576317 Camera1.mp4 contains video from the rear-facing camera in Sgt. Farley's cruiser, showing the interior of the cruiser, and has the same body microphone audio feed. This data file is referred to herein as Farley Camera 2.

- The data file labeled on the disc as James Leonard_20180725_04_47_Troop D_UNCATEGORIZED_1953631102 Cam1.mp4 contains video and audio from the forward-facing camera in Tr. Leonard's vehicle. This data file is referred to as Leonard Camera.

After the hearing, the parties submitted memoranda in support of their respective positions, the latter of which was docketed July 16, 2019, and the matter was taken under advisement.

However, on July 18, 2019, the State filed a Motion to Reopen the Record to Introduce the Watchguard Video Recording of Officer Ben Savage. Officer Savage was one of three Portland Police officers who came to the scene of the stop in this case. According to the State's Motion, the Savage video did not come to the attention of the State's attorney until after the June 27, 2019 suppression hearing, and has since been provided to the Defendant's attorney. The State's Motion proposed that the Savage Watchguard video be admitted into the record as State's Exhibit 2, and also indicated that the State would not be opposed to reopening the testimonial record to allow Officer Savage to testify and be cross-examined.

The court decided that the evidentiary status of the Savage video needed to be determined before the court ruled on the Defendant's Motion to Suppress. In an Order dated July 19, 2019, the court set a deadline for Defendant to respond to the State's Motion to Reopen. The July 19, 2019 Order also indicated that '[t]he court has not

2

and will not view State's proposed Exhibit 2 unless and until it is admitted into the record." Order of July 19, 2019 at 1.

The Defendant filed an Opposition to the State's Motion August 27, 2019 and the State filed its Reply to the Defendant's Opposition September 3, 2019, at which point the court took both the Defendant's Motion to Suppress and the State's Motion to Reopen under advisement.

This Order addresses first the State's Motion to Reopen and then turns to the Defendant's Motion to Suppress.

### *State's Motion to Reopen the Record to Introduce the Watchguard Video Recording Of Officer Ben Savage*

Defendant opposes the State's Motion to Reopen the Record. *See* Defendant's Opposition to State's Motion to Reopen Evidence at 1. The Defendant contends that the court should not respond to what the Defendant's Opposition calls a discovery violation by "[r]ewarding the [S]tate with a continuance and an opportunity to reopen the evidence." *Id.*

The State's Motion recites the circumstances underlying the late production of Officer Savage's Watchguard video, and those circumstances support the State's position that the failure to produce the video in a timelier manner was excusable. Specifically, it is readily understandable that the State's initial discovery overlooked the Savage video—the stop of Defendant's vehicle was not initiated by Officer Savage or the Portland Police. As far as the record shows, the Portland Police officers came to the scene without being requested, to provide back-up support. There is no

3

indication that the late disclosure was the result of bad faith or misconduct on the part of either the prosecutor or the police.

Based on the Defendant's objection and the late disclosure of State's Ex. 2, the State's Motion to Reopen will be denied. The stop occurred almost a year ago and to grant the State's Motion to Reopen would likely necessitate reopening the hearing for the Defendant to be given the opportunity to question Officer Savage, a step that would likely delay resolution of the Defendant's Motion to Suppress for weeks if not months. Moreover, as noted below, the State concedes that whatever statements the Defendant made that are recorded on State's Ex. 2 would have to be suppressed even if the exhibit were admitted, because the Defendant was under restraint to a degree associated with formal custody at the time, and also because the Portland officers either questioned the Defendant without giving a *Miranda* warning or at least engaged in conduct that would reasonably elicit an unwarned response from Defendant.

The result of denying the State's Motion to Reopen will of course be to exclude and suppress the Defendant's statements on the Watchguard video, which the court still has not viewed or heard and will not view or hear. This is tantamount to a discovery sanction, although the Defendant has not filed a separate motion for sanctions based on the late disclosure of the Savage video. Even had such a motion been filed, based on the excusable nature of the late disclosure, the court likely would not have imposed any sanction beyond excluding the contents of the Savage video.

4

## *Defendant's Motion to Suppress*

For purposes of the Defendant's Motion to Suppress, the court makes the following findings of fact and adopts the following conclusions of law:

### Findings of Fact

On July 25, 2018, Trooper James Leonard of the Maine State Police (MSP) responded to a call involving a complaint that a driver on Interstate 295 southbound in Yarmouth had pointed a black handgun in a threatening manner at another driver. Trooper Leonard met with the driver who lodged the complaint and obtained a description of the driver, the driver's vehicle and the vehicle's registration number.

After the vehicle information had been circulated to other MSP troopers on patrol so they could be on lookout for the vehicle, MSP Sgt. Christopher Farley saw a vehicle matching the description heading southbound on I-295 in Portland near the Washington Avenue exit. The driver took the next exit, to Franklin Street. Sgt. Farley followed the vehicle and executed a traffic stop as the vehicle turned onto Marginal Way (Farley Camera 1 1:08).[1] Sgt. Farley positioned his cruiser behind the vehicle with the front of the cruiser protruding into the travel lane so as to shield Defendant's vehicle and anyone standing beside it.

Sgt. Farley ordered the driver, identified as the Defendant, Samuel Whitney, to exit his vehicle with his hands in the air. Defendant exited the vehicle cooperatively, leaving the driver's side door open. Sgt. Farley directed the Defendant to lie down on

---

[1]  This and similar parenthetical references are to times on the data file in State's Ex. 1 containing forward-facing cruiser camera video from Sgt. Farley's cruiser.

the ground in front of Sgt. Farley's cruiser with his hands behind him and handcuffed the Defendant. He asked the Defendant if there were other passengers in the vehicle, and the Defendant said there were not. Sgt. Farley then checked the vehicle and determined no one else was inside. (Farley Camera 1 2:48-53).

.Sgt. Farley got the Defendant to rise to his feet and stand at the front of the cruiser on the side away from the travel lane. (Farley Camera 1 3:35) Meanwhile three Portland Police Department officers came to the scene (Farley Camera 1 3:50), presumably to provide assistance or back-up.

One of the Portland officers was Officer Ben Savage, whose Watchguard video was the subject of the State's Motion to Reopen the Record. They stood near the Defendant while Sgt. Farley returned to the Defendant's vehicle. (Farley Camera 1 4:50). He reached into the driver's side door pocket of Defendant's vehicle and noted the presence of a black handgun there.

When Sgt. Farley returned to where the Defendant was standing beside the Portland officers (Farley Camera 1 5:15), his body microphone records the Defendant in the midst of talking about the incident that led to the stop. It is not clear whether the Defendant's statements were in response to any question or were spontaneous but he was speaking narratively without being asked questions. Sgt. Farley stood listening to the Defendant for about 17 seconds (Farley Camera 1 5:15-5:32) and then left momentarily for a few seconds, and returned and listened further for another half minute as the Defendant continued his narrative. (Farley Camera 1 5:39-6:17).

Sgt. Farley then asked the Portland officers to stay with the Defendant and

6

went briefly to Defendant's vehicle, and then came back and entered his cruiser. (Farley Camera 1 6:17-6:33).

Sgt. Farley's purpose in getting into his cruiser was to communicate with MSP headquarters regarding a records check and for other information. While Sgt. Farley was thus occupied in his cruiser, the Defendant remained outside with the Portland Police officers.

Inside the cruiser, Sgt. Farley spoke with Tr. Leonard over the telephone (or radio), and at one point indicated that the Defendant had described a "road rage incident," and that Sgt. Farley was planning "to read him Miranda" and question him. (Farley Camera 1 10:41-10:55).

After being in the cruiser for about six minutes, Sgt. Farley got out of the cruiser and went to the Defendant. (Farley Camera 1 12:25). He asked the Defendant, "Do you want to tell me in a minute what happened?" The Defendant answered, "I want to tell you right now." (Farley Camera 1 12:27-12:30). Sgt. Farley thanked the Portland police officers and they departed (Farley Camera 1 12:45), having been at the scene for about nine minutes.

Sgt. Farley then told the Defendant that he would ask the Defendant to "sit in my car just like that [remaining handcuffed] totally for my safety right now. I'll read you your rights and then you can tell me what happened." (12:50-13:00). Sgt. Farley then placed the Defendant, still handcuffed, in the front passenger seat of the cruiser and then went around and sat in the driver's seat.

After repositioning his cruiser slightly so as to place it directly behind the Defendant's vehicle rather than protruding into the street, Sgt. Farley said to the Defendant, "All right—so I do want to ask you what happened" and the Defendant immediately said, "I'll totally tell you" or words to that effect—a simultaneous radio transmission makes his exact words difficult to understand. (Farley Camera 2 14:07-14:10).[2]

Sgt. Farley recited the Defendant's *Miranda* rights and after each one asked the Defendant whether he understood his right and each time the Defendant indicated he understood. (Farley Camera 2 14:34-15:20). When Sgt. Farley asked the Defendant if he was willing to answer questions, Defendant said, "Whatever you got" and then confirmed that he was saying that he was willing to answer questions. (Farley Camera 2 15:20-25).

Sgt. Farley's opening question was, "So what happened, Sam?" (Farley Camera 2 15:40). Over the next seven minutes, the Defendant recounted his version of events, with occasional questions from Sgt. Farley. (Farley Camera 2 15:42-22:43). At no time was there any reference by either Defendant or Sgt. Farley to any statement that the Defendant might have made to the Portland officers. Sgt. Farley did not point out that that he had heard portions of the Defendant's statements about the incident outside the cruiser.

---

[2] This and similar parenthetical references are to times on the data file in State's Ex. 1 containing video from the interior-facing cruiser camera in Sgt. Farley's cruiser.

After his questions, Sgt. Farley indicated that another trooper would be handling the Defendant's case and deciding what course of action to take. He adjusted the Defendant's handcuffs and got back into the driver's seat. There was further conversation during which Sgt. Farley asked the Defendant if he realized that Sgt. Farley was planning to stop him. (Farley Camera 2 25:45-26:45). Defendant continued to talk about his National Guard activity and wanted to know whether he was going to be charged and what he could be charged with (Farley Camera 2 27:00-28:30). Sgt. Farley asked the Defendant how he would react if another driver showed a handgun and pointed out that a mere display of a gun can put another person in fear. (Farley Camera 2 28:45-29:35).

When Trooper Leonard arrived at the scene (Farley Camera 2 30:35), Sgt. Farley got out of the cruiser and began speaking with Trooper Leonard while Defendant remained in Sgt. Farley's vehicle. The two officers discussed briefly what they had heard from the Defendant and from the woman who telephoned in the complaint about the Defendant. Sgt. Farley also told Tr. Leonard that he had administered the *Miranda* warnings to the Defendant. Sgt. Farley then directed the Defendant to exit his cruiser and take a seat in Trooper Leonard's cruiser. The Defendant was still handcuffed.

The video from Tr. Leonard's cruiser is from a forward-facing cruiser camera, and it begins after Defendant has already taken a seat inside Tr. Leonard's cruiser. The audio in this data file begins about one minute after the video commences. (Leonard Camera 0:59). When Tr. Leonard indicated that he wished to ask the

9

Defendant some questions, the Defendant again expressed complete willingness to answer questions—"You can ask me anything you want." (Leonard Cruiser Camera at 1:25). During the conversation, the Defendant did most of the talking, speaking at length, often talking over Tr. Leonard. (Leonard Camera at 1:55-8:45). Most of Tr. Leonard's questions were to clarify, but often he simply said "OK" as the Defendant continued to present his account without any prompting.

Tr. Leonard then told the Defendant what the woman who made the complaint had said about Defendant's display of his handgun and (Leonard Camera 8:50-9:45).

After about ten minutes, Tr. Leonard placed a telephone call to the dispatcher in order to speak to the "on-call ADA in Cumberland." (Leonard Camera 11:45). Eventually he was connected with a prosecutor with the Cumberland County District Attorney's Office (Leonard Camera 13:08). Tr. Leonard told the prosecutor, "I have something I need to run by you" and he stepped outside his vehicle to continue the conversation. (Leonard Camera 13:36-13:49). Tr. Leonard's audio feed is evidently associated with his cruiser camera instead of from a body microphone, so the contents of the conversation are not audible or of record.

After completing the conversation with the prosecutor, Tr. Leonard went forward to Sgt. Farley's cruiser, which was still parked in front of Tr. Leonard's cruiser. (Leonard Camera 19:27). The Leonard Camera video shows Tr. Leonard conversing with Sgt. Farley and going farther forward to the Defendant's vehicle and then returning to speak to Sgt. Farley again. (Leonard Camera 19:27-21:57). The

10

audio of this conversation was not captured either on the Leonard Camera video or either of the data files from Sgt. Farley's cruiser.

Tr. Leonard then returned to his cruiser (Leonard Camera 22:00) and Sgt. Farley's cruiser drove away. Inside his cruiser, Tr. Leonard told the Defendant that he was going to summons the Defendant rather than arrest him and explained that he was charging the Defendant with a misdemeanor offense rather than a felony, partly because Defendant had been "super-cooperative" and based on Defendant's lack of a criminal record. (Leonard Camera 22:30-26:45). Tr. Leonard then asked Defendant questions to enable him to complete the summons. (Leonard Camera 28:00-33:00).

Tr. Leonard placed another telephone call to the dispatcher in order to obtain an arraignment date and other information to write on the summons. (Leonard Camera 36:10). After obtaining the necessary information, Tr. Leonard allowed Defendant to step out of the cruiser and removed the handcuffs. (Leonard Camera 42:18). There is no audio thereafter recording of their conversation outside the cruiser, but the video depicts Tr. Leonard showing the summons to Defendant and the Defendant signing it. Defendant then entered his vehicle (Leonard Camera 844:22) and drove away.

At no time during the entire stop was the Defendant told that he was under arrest, despite being in handcuffs.

11

## Conclusions of Law

The sole issue raised in the Defendant's Motion to Suppress concerns the admissibility of his statements made after the traffic stop. Defendant does not challenge the validity of the traffic stop or the directive to exit his vehicle.

Specifically, the Defendant asserts that his inculpatory statements during unwarned custodial interrogation by the Portland police officers tainted his subsequent waiver of *Miranda* rights and rendered his statements to Sgt. Farley and Tr. Leonard inadmissible. Relying primarily on the United States Supreme Court decision in *Missouri v. Seibert*, 542 U.S. 600 (2004), the Defendant contends that all of his statements to the Portland officers and then to Sgt. Farley and Tr. Leonard must be suppressed.

The State concedes that Defendant was in custody while he was waiting outside the cruiser with the Portland officers because he was restrained to a degree associated with formal arrest, and also concedes that the Portland officers acted "in such a manner as to be reasonably likely to elicit an incriminating response" by Defendant. *See* State's Memorandum of Law at 3, *citing State v. Bryant*, 2014 ME 94, ¶ 10, 97 A.3d 595; *State v. Bragg*, 2012 ME 102, ¶ 16, 48 A.3d 769.

However, the State contends that the facts and circumstances of this case bear little if any resemblance to those in *Seibert* and that all of Defendant's statements after the *Miranda* warnings are admissible.

The facts in *Seibert* involved a two-step interrogation strategy—an unwarned first phase followed by a warned second phase—that was intended to vitiate the

12

efficacy of *Miranda* warnings. The plurality opinion pointed out that "the facts here . . . by any objective measure reveal a police strategy adapted to undermine the Miranda warnings." 542 U.S. at 616. The plurality described the two-step interrogation strategy utilized by the police in *Seibert* as follows:

> "The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment.
>
> . . . .
>
> The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk."

542 U.S. at 616-17.

In a separate concurrence in *Seibert,* Justice Kennedy indicated that the controlling question should be whether the two-step interrogation—unwarned interrogation followed by warned interrogation—was a deliberate or intentional tactic:

> The plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on "whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object" given the specific facts of the case. This test envisions an objective inquiry from the perspective of the

suspect, and applies in the case of both intentional and unintentional two-stage interrogations. In my view, this test cuts too broadly. *Miranda*'s clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.

545 U.S. at 621-22 (internal citations omitted).

In *State v. Nightingale*, the Maine Law Court noted that most of the federal circuit courts have adopted Justice Kennedy's narrower test. 2012 ME 132, ¶27, 58 A.3d 1057, and endorsed the same view:

We now follow the majority of the federal circuits in applying Justice Kennedy's *Seibert* analysis. Accordingly, the State bears the burden of demonstrating by a preponderance of the evidence that the two-step procedure was not deliberately employed to undermine the efficacy of the *Miranda* warnings. In determining whether the procedure was deliberate, courts must consider "the totality of the objective and subjective evidence.

2012 ME 132 at ¶29, 58 A.3d 1057 (internal quotes and citations omitted).

Based on the totality of circumstances as set forth in the foregoing findings, this court concludes that the State has met that burden:

- There is no evidence of any coordinated interrogation between Sgt. Farley (or Tr. Leonard) and the Portland police officers. There is no evidence that Sgt. Farley asked or intended for the Portland police to question the Defendant. Sgt. Farley did not participate in any questioning outside his cruiser. He did listen to the Defendant's account for a few seconds initially and then for a half minute, but asked no questions and did not hear the Portland officers asking any questions. The fact that he listened only briefly and then went away while the

14

Defendant was still talking plainly signaled that he was not a participant in whatever went on between the Defendant and the Portland officers.

- Whatever unwarned interrogation might have taken place by the Portland officers was by no means exhaustive. They were at the scene for a total of less than 10 minutes and could only have questioned the Defendant, if they did at all, for a fraction of that.

- Whatever unwarned custodial interrogation might have taken place by the Portland officers was in violation of *Miranda* and thus inadmissible, but there is no evidence that it was coercive. In fact, the Defendant's narrative statements outside the cruiser coupled with his eagerness to tell his side of the story indicate he was speaking voluntarily throughout, whether or not he was answering questions.

- During Sgt. Farley's questioning, there was no reference to or discussion about Defendant's interaction with the Portland officers that would indicate to Defendant that his questioning was a continuation of whatever occurred between Defendant and the Portland officers.

- It would have been obvious to the Defendant that there was no coordination between the Portland police and Sgt. Farley in terms of interrogation. He could see that Sgt. Farley had not paid much attention at all to what he was telling the Portland officers. The Defendant also

15

knew that the Portland officers departed without informing Sgt. Farley of what the Defendant had said while he was in his cruiser.

- It also would be apparent to the Defendant that the unwarned interrogation was not conducted by the same officers or even the same law enforcement agency as those involved in the subsequent warned interrogation. Defendant knew that Sgt. Farley was the officer who had stopped him and he heard Sgt. Farley ask the officers to stay with the Defendant while he was inside his cruiser. Troopers with the Maine State Police wear uniforms and drive different colored marked vehicles than do officers of the Portland Police Department, so it should have been obvious that the Portland officers were from a different law enforcement agency than Sgt. Farley. It was, or should have been, obvious to the Defendant that the Portland officers were playing a limited role at the traffic stop.

- Defendant was not only willing but even eager to answer questions, a factor that bears substantially on the voluntariness of all of his statements.

In sum, the totality of the circumstances in this case presents almost none of the factors that supported the decision in *Seibert*. The only circumstance that aligns with *Seibert* is that Sgt. Farley's questioning began just after the Defendant's interaction with the Portland officers had concluded.

16

The facts of this case bear much more resemblance to those in a precursor decision to *Seibert,* the United States Supreme Court decision in *Oregon v. Elstad,* 470 U.S. 298 (1985)—a decision also discussed in the Law Court's *Nightingale* opinion. 2012 ME 132, ¶¶ 20-22, 58 A.3d 1057. In a passage from the majority opinion in *Elstad* that is quoted in the Law Court's *Nightingale* opinion, the Court said:

> [T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

470 U.S. at 318.

Based on the totality of circumstances, this court concludes that the State has shown by a preponderance of the evidence that there was no deliberate or intentional strategy on the part of any police officer or agency to conduct interrogation so as to undermine or vitiate the efficacy of *Miranda* warnings. Although a two-step interrogation may have occurred, the post-*Miranda* part involved officers who were not involved in the pre-*Miranda* part, and there was no coordination between the two parts. The interaction between Defendant and the Portland officers may have been

17

"technically in violation of *Miranda*," to use the phrase from *Elstad*, but it was neither coercive nor designed to circumvent or undermine *Miranda*.

Based on the same totality of the circumstances, this court concludes that the State has shown beyond a reasonable doubt that the Defendant's statements during the interaction with the Portland police officers were voluntary, albeit inadmissible because they were not preceded by *Miranda* warnings, and that the Defendant's statements to Sgt. Farley and Tr. Leonard were knowing and voluntary, made after a valid waiver of his *Miranda* rights, and therefore are admissible in evidence.

Accordingly, it is hereby ORDERED AS FOLLOWS:

1. Defendant's Motion to Suppress is denied as to all statements made by Defendant to Sgt. Farley and Tr. Leonard after Sgt. Farley gave the Defendant *Miranda* warnings. Defendant's Motion is granted without objection as to all statements made by him prior to *Miranda*.

2. The State's Motion to Reopen the Record to Introduce the Watchguard Video Recording of Officer Ben Savage is denied.

Dated September 12, 2019

_____
A. M. Horton, Justice

18